Evan J. Spelfogel (474440)
Robyn Ruderman (Admitted *pro hac vice*)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
Attorneys for Defendant

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-------------------------------------- x

LUANN P. GOULD,

                Plaintiff,

– against –

LUCENT TECHNOLOGIES, INC.,

                Defendant.
-------------------------------------- x

ORIGINAL FILED VIA ECF

05 CV 11118 (PBS)

**DEFENDANT'S
RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Local Rules of the Court for the District of Massachusetts, Defendant Lucent Technologies, Inc. ("Lucent"), by its attorneys, Evan J. Spelfogel and Robyn Ruderman of Epstein Becker & Green, P.C., hereby submits the following statement of material facts as to which there is no genuine issue to be tried.

## FACTS

A.   **Absence Control Plan**

       1.    Lucent maintains a comprehensive five-level absenteeism policy, the ACP. [Campbell Aff. ¶ 3, Exhibit A][1]

---

[1] The Affidavits of Katherine Campbell, Margaret Blumer and Brian Ahern, sworn to on August 18, 2006 are referred to as "Campbell Aff., "Blumer Aff.," and "Ahern Aff.," respectively. The relevant excerpts of the Deposition Transcripts of Pyong Deletis ("Deletis T.") and Plaintiff ("Gould T.") are annexed to the Affirmation of Robyn Ruderman ("Ruderman Aff.") as Exhibits A and B, respectively.

NY:1295524v1

2. The ACP is designed to foster the continuous improvement of attendance; to recognize and reinforce good attendance; and to motivate and rehabilitate employees with excessive absenteeism. [Campbell Aff. ¶ 3, Exhibit A] The ACP operates as follows:

3. Under the ACP, employees with more than five non-exempt absences in a calendar year are placed on Level I. [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-51] Exempt, non-chargeable absences under the ACP include, inter alia, leaves under the FMLA and SNLA, Jury Duty, Unpaid Holiday, in-patient hospitalization, scheduled day-care surgery (counted independent of FMLA), court attendance, deaths and/or funerals, and disciplinary suspensions. [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-50] Action will not be taken against the employee for those excludable absences. [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-50]

4. Other non-triggering absences include, inter alia, deaths and/or funerals, court attendance, and in-patient hospitalization and recovery period absences. [Campbell Aff. ¶ 4, Exhibit A] While action will not be triggered for these types of actions, they are included in calculating the total number of chargeable absences. [Id.]

5. Employees placed on Level I receive an Informal Discussion/Verbal Warning, and are counseled about their attendance record and reminded of Lucent's policy on attendance, "stressing that it is the employee's responsibility to be at work when scheduled." [See Exhibit A to Campbell Aff.; Gould T. 51]

6. Employees placed on Level I at the beginning of a calendar year are allowed five additional days of non-exempt absences before triggering action moving them to Level II. [See Exhibit A to Campbell Aff.] Employees on Level II receive a Formal Discussion/Written Warning, notifying them that the next non-exempt absence for that year will place the employee on Level III. [See Exhibit A to Campbell Aff.; Gould T. 51]

7. Employees placed on Level II at the beginning of the calendar year are allowed four additional days of non-exempt absences before triggering action moving them to Level III. [See Exhibit A to Campbell Aff.; Gould T. 51] At Level III, the employee's supervisor, manager, and Union representative meet with the employee, review the attendance record, and notify the employee that the next non-exempt absence that year will place employee on Level IV. [See Exhibit A to Campbell Aff.] Employees are further warned that termination of employment is possible if his or her unsatisfactory attendance continues. [Id.]

8. Employees on Level III at the beginning of the calendar year are allowed four additional days of non-exempt absences before triggering action moving them to Level IV. [See Exhibit A to Campbell Aff.] At Level IV, the employee's supervisor, manager, and Union representative meet with the employee to review his or her attendance and give him a Final Warning/Paper Suspension, notifying the employee that he or she is on "Final Warning" and that any other additional chargeable absence that year will result in Level V action -- review for termination of employment. [Campbell Aff. ¶ 5, Exhibit A; Gould T. 52]

9. Employees on Level IV at the beginning of the calendar year are allowed three additional days of non-exempt absences before triggering action moving them to Level V. [See Exhibit A to Campbell Aff.; Gould T. 52] At Level V, the employee's immediate supervisor prepares and issues a Level V Termination Review form, which is submitted to the Absence Control Board (the "Board") for review and determination of whether the employee should be placed on probation or be terminated from employment. [Campbell Aff. ¶ 6]

10. In determining what Level V action should be administered, the Board considers the following factors: the employee's attendance record for the current year and

previous absence history; reasons for the absences; character of service; and consistency in the administration of the ACP. [Campbell Aff. ¶ 6]

11.     Since 1997, with the exception of one employee, every employee who reached Level 5 under the ACP was terminated from Lucent's employment, and not placed on probation. [Campbell Aff. ¶ 6]

12.     For an example of how employees progress through the applicable attendance levels, see Exhibit A to Campbell Aff., p. 18.

13.     Employees on Level I or II must complete one year of employment without any non-exempt absences in order to lower one level. [Campbell Aff. ¶ 7, Exhibit A] For each subsequent year of employment completed without any non-exempt absences, the employee will revert back to another, lower level. [Id.] An employee on Level 3, 4, or 5 must achieve two consecutive years of employment without any non-exempt absences in order to revert back a level. [Id.] For each subsequent year they complete without any non-exempt absence, they will continue to lower one level. [Id.]

B.     **Plaintiff's Absenteeism Problem at Lucent**

14.     Plaintiff commenced employment at Lucent as a Production Associate on October 16, 1979. [Campbell Aff. ¶ 8]

15.     At all relevant times during her employment, she was a member of, and represented by, the Communications Workers of America, AFL-CIO, Local 1363 ("the Union").[2] [Campbell Aff. ¶ 8]

---

[2] The terms and conditions of Plaintiff's employment were governed by, among other things, a collective bargaining agreement ("CBA") between the Union and Lucent.

NY:1295524v1

- 4 -

16. Shortly after the commencement of her employment, and continuing throughout her entire employment at Lucent, Plaintiff experienced continual and repeated attendance problems. [Campbell Aff. ¶ 9]

17. While Plaintiff's absenteeism issues commenced soon after her employment at Lucent, the allegations in Plaintiff's Complaint focus on those absences occurring from 1996 to 2003. For that period of time, Plaintiff's attendance record can be summarized as follows:

- In 1996, Plaintiff had nine non-exempt absences. Plaintiff's non-exempt absences that year triggered Level I action. Plaintiff also had a total of 58 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 1997 on Level I, for that year, Plaintiff had 86 non-exempt absences.[3] Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 1998 on Level I, for that year, Plaintiff had 124 chargeable (but not all actionable) absences. Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

---

[3] Plaintiff should have been placed on Level II when she reached her sixth non-exempt day of absence, but was not.

- Entering 1999 still on Level I, for that year, Plaintiff had 119 chargeable (but not all actionable) absences. [Campbell Aff. ¶ 9] Plaintiff's non-exempt absences that year triggered Level II action.[4]

- Entering 2000 on Level II, for that year, Plaintiff had 110 non-exempt absences. Plaintiff's non-exempt absences that year triggered Level III action. Plaintiff also had a total of 4 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 2001 on Level III, Plaintiff had 36 non-exempt absences, initially triggering Level IV action. This action was reversed because it was taken beyond the time period provided under the ACP.[5] Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 2002 on Level III, Plaintiff had 13.5 non-exempt absences, and should have been moved to Level IV, but inadvertently was not. Plaintiff also had a total of 27 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 2003 on Level III, Plaintiff had six non-exempt absences — triggering Level IV and Level V action. Plaintiff also had a total of 16.5

---

[4] Plaintiff's should have progressed to Levels III and IV.
[5] Lucent must take action within 30 calendar days after the employee returns from that absence. [See Exhibit A to Campbell Aff., 9-17]

exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

18.  In summary, from 1996 through 2003, Plaintiff had a total of 503.5 non-exempt, chargeable absences.

19.  During this same period of time, Plaintiff requested and was granted at least seven leaves of absence under the FMLA, for a combined total of 285.5 days off from work. [Campbell Aff. ¶ 10; Gould T. 47-48] Not one of these FMLA absences counted toward or triggered any action against Plaintiff under the ACP. [Campbell Aff. ¶ 10; Gould T. 47]

20.  In addition to the counseling she received each time she progressed to a higher level under the ACP, at the end of each year, Plaintiff also received an "End of Year Status Review," where she was counseled about her attendance record and the level of action against her. [Campbell Aff. ¶ 11; Gould T. 98]

## C.  Plaintiff's Termination of Employment for Non-Exempt, Chargeable Absences in 2003

21.  Plaintiff entered 2003 on Level III. [Gould T. 52] Under the ACP, the next non-exempt, chargeable absence exceeding four days in 2003 would progress Plaintiff to Level IV. [Campbell Aff. ¶ 12] Further, the next non-exempt, chargeable absence after that in 2003 would result in Level V action – probation or termination. Id.

### 1. Level IV Action

22.  On January 6-8, 2003, Plaintiff was absent from work for three days. [Gould T. 52-53] These absences did not fall under any of the exclusions contained in the ACP and were counted toward Plaintiff's four day allotment. [Gould T. 52-53]

23.    From March 3-28, 2003, Plaintiff was out for approximately three and one-half weeks. [Campbell Aff. ¶ 14] As this leave of absence was requested and granted under the FMLA, none of this time was counted against Plaintiff. [Gould T. 53]

24.    On May 5-6, 2003, Plaintiff missed an additional two days of work. Plaintiff claimed that these May absences were taken pursuant to the FMLA and, therefore, were non-chargeable. [Gould T. 56] More specifically, Plaintiff claimed she had to miss two days of work to care for her daughter, who was home sick with the chicken pox. [Gould T. 54, 65]

25.    Plaintiff's daughter saw the doctor only once when ill with the chicken pox. [Gould T. 54]

26.    On May 7, 2003, Plaintiff's supervisor, Brian Ahern ("Ahern"), informed Plaintiff that she needed to provide FMLA documentation within 15 days in order to qualify her May absences as FMLA leave. [Ahern Aff. ¶ 4] Mr. Ahern informed Plaintiff that she would progress to Level IV if Plaintiff's leave failed to qualify under the FMLA, as this two day absence (if non-exempt) placed Plaintiff over her four day allotment. [Ahern Aff. ¶ 4]

27.    While Plaintiff completed and provided Lucent with FMLA paperwork within the 15-day time frame, the documentation was vague, merely indicating that Plaintiff was absent due to a one-day illness of her daughter, which was neither chronic nor required additional treatment. [Blumer Aff. ¶ 4, Exhibit A; Gould T. 57-59, 65]

28.    As this documentation did not support a determination that Plaintiff's daughter suffered from a "serious health condition" within the meaning of the FMLA, e.g., was ill for more than three consecutive days, on or around May 23, 2003, Peggy Blumer ("Blumer"), Lucent Benefit Delegate, asked Plaintiff to submit additional information concerning her

daughter's illness. [Blumer Aff. 4; Gould T. 60-61] At that time, Lucent had not yet denied Plaintiff's request for FMLA leave. [Blumer Aff. ¶ 4]

29.     To further assist Plaintiff in qualifying her leave under the FMLA, Plaintiff's supervisor, Pyong Deletis ("Deletis") personally contacted Blumer, inquiring whether she could do anything to help Plaintiff. [Deletis T. 32] Blumer informed Deletis, "just make sure she provides all the documentation that is necessary." [Deletis T. 32] Deletis communicated this to Plaintiff, stressing the importance of providing detailed information so that she could get her FMLA leave approved. [Deletis T. 32]

30.     While Plaintiff provided Lucent with this additional paperwork, it too failed to establish that her daughter suffered from any serious medical condition. [Blumer Aff. ¶ 6, Exhibit B; Gould T. 57-59, 65] As a result, Lucent: (i) disqualified Plaintiff's May 5-6, 2003 leave under the FMLA for failure to meet the criteria of a "serious health condition;" and (ii) progressed Plaintiff to Level IV under the ACP, for which she received a final warning. [Blumer Aff. ¶ 6, Exhibit C; Campbell Aff. ¶ 15, Exhibit B]

**2. Level V Action**

31.     On July 7, 2003, Plaintiff missed an additional day of work to care for her daughter, who was home from school <u>one day</u> with conjunctivitis. [Gould T. 65, 72]

32.     The following day, on July 8, 2003, Plaintiff's supervisors, Steve Sickel (Sickel"), Deletis, and Ahern, met with Plaintiff to discuss her May absences. [Ahern Aff. ¶ 7; Gould T. 67-70] She was informed that she needed to contact her medical provider to resolve the status of her May leave. [Ahern Aff. ¶ 7] She was further informed that if she could not successfully demonstrate that her May leave qualified under the FMLA, and overturn Lucent's prior determination concerning this leave, she would progress to Level V for her subsequent July 7 non-exempt absence, which could result in termination of her employment. [Ahern Aff. ¶ 7;

Gould T. 70] At that time, Plaintiff had not submitted any paperwork demonstrating that her daughter's conjunctivitis qualified under the FMLA.

33.     Following this meeting, on or around July 11, 2003, Plaintiff, for the third time, submitted additional medical certification concerning her daughter's two-day illness in May. [Blumer Aff. ¶ 7; Exhibit D; Gould T. 68] The certification stated that: "Ms. Gould's daughter was being treated for chicken pox" and could not go to school for <u>two</u> days. [Blumer Aff. ¶ 7, Exhibit D; Gould T. 72]

34.     Because this certification failed to establish that Plaintiff's daughter suffered from any condition lasting more than three consecutive days, by letter dated July 14, 2003, Lucent sustained its determination that Plaintiff's leave failed to qualify under the FMLA. [Blumer Aff. ¶ 7, Exhibit E]

35.     On July 25, 2003, in jeopardy of losing her employment, Plaintiff attempted to qualify her one day leave on July 7, 2003 under the FMLA by providing to Lucent, for the first time, FMLA documentation. [Blumer Aff. ¶ 8, Exhibit F] The documentation stated that "patient needed to miss work on Monday, July 7, 2003 to stay home with her daughter, who had bacterial conjunctivitis and was contagious" and "needed to be kept home for 24 hours." [Blumer Aff. ¶ 8, Exhibit F] It further stated that the daughter's condition was neither chronic nor required additional treatments. [Blumer Aff. ¶ 8, Exhibit F]

36.     By letter dated July 28, 2003, Lucent informed Plaintiff that her July 7 leave did not qualify under the FMLA. [Blumer Aff. ¶ 8, Exhibit G] Consequently, on July 30, 2003, Plaintiff was placed on Level V. [Campbell Aff. ¶ 16, Exhibit C]

37.     The next day, Plaintiff's Level V action was submitted to the Board for a determination of whether her employment should be terminated. [Campbell Aff. ¶ 17]

38. Considering Plaintiff's prior attendance record, and all her previous warnings and counseling, the Board decided to terminate Plaintiff's employment. Effective August 1, 2003, Plaintiff's employment was terminated for unsatisfactory attendance. [Campbell Aff. ¶ 17, Exhibit D]

39. On September 19, 2003, in response to the termination, and as a final attempt to resolve the status of the May and July, 2003 leaves, Plaintiff provided Lucent once again with additional documentation concerning the reasons for the absences, including a letter from her daughter's school dated September 18, 2003. [Blumer Aff. ¶ 9, Exhibit H] The letter from the school stated, among other things, that in connection with her chicken pox, "Shelby was only absent for 2 days before she was cleared to return to school...." [Id.] In connection with the conjunctivitis, the letter stated that "Shelby missed one day of school when she contracted conjunctivitis last July." [Blumer Aff. ¶ 9, Exhibit H; Gould T. 86]

40. After careful review of these most recent documents, Lucent denied Plaintiff's request to qualify the May leave under the FMLA for the final time and sustained her job termination. [Blumer Aff. 9, Exhibit I]

D.  **Plaintiff Was Not Eligible for Any Time Off Under the SNLA**

41. Under Lucent's policy, employees are given five "Excused Work Days" ("EWD"), one of which is designated by Lucent – Columbus Day. [Campbell Aff. ¶ 18, Exhibit E]

42. Recognizing "that it may be in the best interest of employees to have the ability to take time off for brief intervals because of personal, immediate needs," Lucent allows up to four of these days to be used in increments of two hours. [Id.]

43. Under the SNLA, these EDWs are a substitute for leave under this State Statue. [Campbell Aff. ¶ 18]; see also Mass Gen. Laws ch. 149, § 52(D)(c) ("an eligible

employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for any of the leave" during any twelve month period).

44. By the time of Plaintiff's May 2003 absence, she had used all of her EWDs, with the exception of the company-wide designated EWD – Columbus Day. [Campbell Aff. ¶ 19]

E.  **Plaintiff Did Not Grieve Any Disciplinary Action Under the ACP**

45. At all times through the disciplinary process, Plaintiff was continuously represented by her Union and had access to comprehensive grievance procedures (up to and including, final and binding arbitration) under the CBA should she disagree with any of the disciplinary actions taken against her. [Campbell Aff. ¶ 20, Exhibit F]

46. Despite the repeated counseling and warnings she received as she progressed though the five levels, and having her Union Steward, and/or the option of having the Union Steward, present during such actions, Plaintiff never filed a grievance over any action until her employment was terminated. [Campbell Aff. ¶ 20]

47. Even then, Plaintiff never fully exhausted the grievance procedures under the CBA. [Campbell Aff. ¶ 20]

48. Instead, with her Union's guidance, in or around January 2004, Plaintiff filed a claim with the United States Department of Labor ("DOL"), claiming a violation of the FMLA. [Blumer Aff. ¶ 10]

49. On March 16, 2004, after a thorough investigation, including interviewing witnesses and reviewing the records concerning Plaintiff's attendance, the DOL dismissed her FMLA claims, finding no violation of the law. [Blumer Aff. ¶ 10]

50.     Upon information and belief, Plaintiff never filed any complaint with the Attorney General's Office concerning her SNLA claims. [Blumer Aff. ¶ 10]

Dated: August 18, 2006

                                            EPSTEIN BECKER & GREEN, P.C.

                                            By:  s/Robyn Ruderman
                                                  Evan J. Spelfogel (474440)
                                                  Robyn Ruderman (Admitted *pro hac vice*)
                                          250 Park Avenue
                                          New York, New York  10177-0077
                                          (212) 351-4500
                                          Attorneys for Defendant