Evan J. Spelfogel (474440)
Robyn Ruderman (Admitted *pro hac vice*)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
Attorneys for Defendant
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| LUANN P. GOULD, | :    <u>ORIGINAL FILED VIA ECF</u> |
|          Plaintiff, | : |
| | :    05 CV 11118 (PBS) |
|    – against – | : |
| | : |
| LUCENT TECHNOLOGIES, INC., | : |
|          Defendant. | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT'S MEMORANDUM OF LAW IN**
**<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................. 1

FACTS ......................................................................................... 2

  A.  Absence Control Plan ........................................................... 2

  B.  Plaintiff's Absenteeism Problem at Lucent ........................... 5

  C.  Plaintiff's Termination of Employment for
     Non-Excludable, Chargeable Absences in 2003 ........................ 8

  D.  Plaintiff Was Not Eligible for any Time Off Under the SNLA ........ 12

  E.  Plaintiff Did Not Grieve Any Disciplinary Action Under the ACP ........ 12

LEGAL ARGUMENT ...................................................................... 13

POINT I    PLAINTIFF'S REQUESTS FOR LEAVE IN MAY
           AND JULY 2003 WERE NOT FMLA QUALIFYING ........................ 13

POINT II   PLAINTIFF'S ABSENCES DID NOT QUALIFY UNDER THE SNLA ........ 15

  A.  Plaintiff is Barred from Prosecuting this Cause of Action
     Because, Upon Information and Belief, Plaintiff Failed to
     File a Complaint with the Attorney General's Office ................. 15

  B.  Plaintiff Utilized All the Time Provided Under the SNLA ............. 16

  C.  Plaintiff's May and July 2003 Absences Do Not Fall Under
     Any of the Purposes for Which  SNLA Leave May Be Granted ........ 16

POINT III  PLAINTIFF CANNOT ESTABLISH A CLAIM OF RETALIATION ........ 17

POINT IV PLAINTIFF'S CLAIMS OF WRONGFUL TERMINATION AGAINST
          PUBLIC POLICY ARE BARRED BY THE FMLA AND SNLA ........ 18

POINT V PLAINTIFF'S CLAIMS FOR INTENTIONAL AND
          NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
          ARE BARRED BY THE EXCLUSIVITY PROVISIONS
          OF THE WORKERS' COMPENSATION ACT ........................ 19

CONCLUSION ............................................................................. 21

# TABLE OF AUTHORITIES

## CASES

**PAGE**

Collins v. Merck-Medco RX Servs., of Texas, L.L.C., No. 200CV1852-X,
2001 WL 1142794 (N.D. Tex. Sept. 24, 2001)...............................................................18

Doe v. Purity Supreme, Inc., 664 N.E.2d 815 (Mass. Super. Ct. 1996) .........................20

Evans v. Henderson, No. 99 C 8332, 2001 WL 109771 (N.D. Ill. Feb. 5, 2001)...................13, 18

Green v. Wyman-Gordon Co., 664 N.E.2d 808 (Mass. Super. Ct. 1996) .....................20

Hillstrom v. Best Western TLC Hotel, 265 F. Supp. 2d 117 (D. Mass. 2003),
aff'd, 354 F.3d 27 (1st Cir. 2003)................................................................................17

Lennon v. Walsh, 798 F. Supp. 845 (D. Mass. 1992)......................................................19

Mayo v. Dalbar, Inc., Civil No. 99-6276,
2002 WL 1020725 (Mass. Super. Ct. Apr. 19, 2002) ................................................19

McCone v. New England Tel. & Tel. Co., 471 N.E.2d 47 (Mass. 1984) ......................19

Melley v. Gillette Corp., 475 N.E.2d 1227 (Mass. Ct. App. 1985),
aff'd, 491 N.E.2d 252 (Mass. 1986) ..........................................................................19

Nagy v. Tee Vee Toons, Inc., No. 03 Civ. 7838 (LAK),
2004 WL 1059512 (S.D.N.Y. May 12, 2004) ............................................................18

Navarro v. Pfizer Corp., 261 F.3d 90 (1st Cir. 2001) ...................................................13

Parisi v. Trustees of Hampshire Coll., 711 F. Supp. 57 (D. Mass. 1989)....................20

Romaine v. Quabaug Corp., No. Civ. A. 04-1239A,
2004 WL 3090175 (Mass. Super. Ct. Dec. 17, 2004).................................................19

Schmittou v. Wal-Mart Stores, Inc., No. Civ. 011763 (JRT/RLE),
2003 WL 22075763 (D. Minn. Aug. 22, 2003) ..........................................................18

## RULES AND STATUTES

29 C.F.R. § 825.114.................................................................................................13, 14

29 U.S.C. § 2612(a)(1)(C) .............................................................................................13

Fed. R. Civ. P. 56 ........................................................................................................1

Mass Gen. Laws ch. 149, § 150 .................................................................................15

Mass Gen. Laws ch. 149, § 52(D) ...............................................................12, 15, 16, 17

## PRELIMINARY STATEMENT

Pursuant to Fed. R. Civ. P. 56, Defendant Lucent Technologies Inc. ("Lucent" or "Defendant"), by its attorneys, Evan J. Spelfogel and Robyn Ruderman of Epstein Becker & Green, P.C., submits this memorandum of law in support of its motion for summary judgment on the grounds that: (i) there are no issues of material fact that require a trial; and (ii) Defendant is entitled to judgment as a matter of law.

The crux of Plaintiff's ("Plaintiff" or "Gould") Complaint centers around allegations that: (1) Lucent denied Plaintiff's request for leave, in May and July 2003, to care for her daughter who had been ill with conjunctivitis and the chicken pox, respectively; (2) the denials of leave violated the Federal Family and Medical Leave Act ("FMLA") and the Massachusetts Small Necessities Leave Act ("SNLA"); and (3) Lucent terminated Plaintiff's employment in retaliation for taking time off that was protected under those statutes.

In August 2003, Lucent terminated Plaintiff's employment for excessive absenteeism, in accordance with the terms of Lucent's Absence Control Plan (the "ACP"). Well before her employment termination, Lucent repeatedly counseled and warned Plaintiff about her on going absenteeism problem and had, in fact, placed her on "final warning." Neither the counseling, warnings or Plaintiff's job termination were predicated in any way on earlier FMLA leaves of absences (totaling 285.5 days) that Lucent granted to Plaintiff from 1996 until her termination.

Plaintiff's May and July 2003 requests for leave did not qualify under either the FMLA or SNLA. Plaintiff's daughter's alleged illnesses did not qualify under the FMLA as "serious health conditions," as defined by the FMLA, since neither alleged incapacity lasted more than three days. Plaintiff also failed to qualify for leave under the SNLA because: (1) she

had already exhausted all of her SNLA time; and (2) the reasons for the May and July absences did not fall within one of the stated purposes for which leave may be taken under the state statute.  In any event, Plaintiff is barred from bringing any civil action under the SNLA because, upon and information and belief, she failed to first file a complaint with the Massachusetts Attorney General's Office (the "Attorney General"), as required by the SNLA, and the three year-statute of limitations period in which to do so has expired.  Since neither the May nor July 2003 absences qualified under the FMLA or SNLA, Plaintiff cannot establish that she engaged in any "protected activity," a required element in a retaliation claim.

Plaintiff's intentional and negligent infliction of emotional distress claims are precluded, as a matter of law, by the exclusivity provisions of the Massachusetts Workers' Compensation Act (the "WCA").  Her claims for "wrongful termination against public policy" are also precluded by the FMLA and SNLA.  Under well-established Massachusetts state law, if a statute already exists to protect a public policy, a plaintiff may not recover for wrongful termination in violation of that public policy.

For these reasons, and those stated below, Plaintiff's lawsuit should be dismissed in its entirety.

## FACTS

### A.    Absence Control Plan

Lucent maintains a comprehensive five-level absenteeism policy, the ACP. [Campbell Aff. ¶ 3, Exhibit A][1]  The ACP is designed to foster the continuous improvement of attendance; to recognize and reinforce good attendance; and to motivate and rehabilitate

---

[1] In this Memorandum of Law, the Affidavits of Katherine Campbell, Margaret Blumer and Brian Ahern, sworn to on August 18, 2006 are referred to as "Campbell Aff.," "Blumer Aff.," and "Ahern Aff.," respectively.  The relevant excerpts of the Deposition Transcripts of Pyong Deletis ("Deletis T.") and Plaintiff ("Gould T.") are annexed to the Affirmation of Robyn Ruderman ("Ruderman Aff.") as Exhibits A and B, respectively.

employees with excessive absenteeism.  [Campbell Aff. ¶ 3, Exhibit A]  The ACP operates as follows:

Under the ACP, employees with more than five non-exempt absences in a calendar year are placed on Level I.  [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-51]  Exempt, non-chargeable absences under the ACP include, inter alia, leaves under the FMLA and SNLA, Jury Duty, Unpaid Holiday, in-patient hospitalization, scheduled day-care surgery (counted independent of FMLA), court attendance, deaths and/or funerals, and disciplinary suspensions. [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-50]  Action will not be taken against the employee for those excludable absences.  [Campbell Aff. ¶ 4, Exhibit A; Gould T. 49-50]  Other non-triggering absences include, inter alia, deaths and/or funerals, court attendance, and in-patient hospitalization and recovery period absences.  [Campbell Aff. ¶ 4, Exhibit A]  While action will not be triggered for these types of actions, they are included in calculating the total number of chargeable absences.

Employees placed on Level I receive an Informal Discussion/Verbal Warning, and are counseled about their attendance record and reminded of Lucent's policy on attendance, "stressing that it is the employee's responsibility to be at work when scheduled."  [See Exhibit A to Campbell Aff.; Gould T. 51]

Employees placed on Level I at the beginning of a calendar year are allowed five additional days of non-exempt absences before triggering action moving them to Level II. Employees on Level II receive a Formal Discussion/Written Warning, notifying them that the next non-exempt absence for that year will place the employee on Level III.  [See Exhibit A to Campbell Aff.; Gould T. 51]

Employees placed on Level II at the beginning of the calendar year are allowed four additional days of non-exempt absences before triggering action moving them to Level III. [See Exhibit A to Campbell Aff.; Gould T. 51]   At Level III, the employee's supervisor, manager, and Union representative meet with the employee, review the attendance record, and notify the employee that the next non-exempt absence that year will place employee on Level IV. [See Exhibit A to Campbell Aff.] Employees are further warned that termination of employment is possible if his or her unsatisfactory attendance continues. [Id.]

Employees on Level III at the beginning of the calendar year are allowed four additional days of non-exempt absences before triggering action moving them to Level IV. [See Exhibit A to Campbell Aff.]   At Level IV, the employee's supervisor, manager, and Union representative meet with the employee to review his or her attendance and give him a Final Warning/Paper Suspension, notifying the employee that he or she is on "Final Warning" and that any other additional chargeable absence that year will result in Level V action -- review for termination of employment.  [Campbell Aff. ¶ 5, Exhibit A; Gould T. 52]

Employees on Level IV at the beginning of the calendar year are allowed three additional days of non-exempt absences before triggering action moving them to Level V.  [See Exhibit A to Campbell Aff.; Gould T. 52]  At Level V, the employee's immediate supervisor prepares and issues a Level V Termination Review form, which is submitted to the Absence Control Board (the "Board") for review and determination of whether the employee should be placed on probation or be terminated from employment.  [Campbell Aff. ¶ 6]

In determining what Level V action should be administered, the Board considers the following factors: the employee's attendance record for the current year and previous absence history; reasons for the absences; character of service; and consistency in the

administration of the ACP.    [Campbell Aff. ¶ 6]    Since 1997, with the exception of one employee, every employee who reached Level 5 under the ACP was terminated from Lucent's employment, and not placed on probation.  [Campbell Aff. ¶ 6]

For an example of how employees progress through the applicable attendance levels, see Exhibit A to Campbell Aff., p. 18.

Employees on Level I or II must complete one year of employment without any non-exempt absences in order to lower one level.  [Campbell Aff. ¶ 7, Exhibit A]  For each subsequent year of employment completed without any non-exempt absences, the employee will revert back to another, lower level.  An employee on Level 3, 4, or 5 must achieve two consecutive years of employment without any non-exempt absences in order to revert back a level.  [Campbell Aff. ¶ 7, Exhibit A]  For each subsequent year they complete without any non-exempt absence, they will continue to lower one level.  [Campbell Aff. 7, Exhibit A]

**B.    Plaintiff's Absenteeism Problem at Lucent**

Plaintiff commenced employment at Lucent as a Production Associate on October 16, 1979.  [Campbell Aff. ¶ 8]  At all relevant times during her employment, she was a member of, and represented by, the Communications Workers of America, AFL-CIO, Local 1363 ("the Union").[2]

Shortly after the commencement of her employment, and continuing throughout her entire employment at Lucent, Plaintiff experienced continual and repeated attendance problems.  [Campbell Aff. ¶ 9]

---

[2] The terms and conditions of Plaintiff's employment were governed by, among other things, a collective bargaining agreement ("CBA") between the Union and Lucent.

While Plaintiff's absenteeism issues commenced soon after her employment at Lucent, the allegations in Plaintiff's Complaint focus on those absences occurring from 1996 to 2003. For that period of time, Plaintiff's attendance record can be summarized as follows:

- In 1996, Plaintiff had nine non-exempt absences. Plaintiff's non-exempt absences that year triggered Level I action. Plaintiff also had a total of 58 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 1997 on Level I, for that year, Plaintiff had 86 non-exempt absences.[3] Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 1998 on Level I, for that year, Plaintiff had 124 chargeable (but not all actionable) absences. Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 1999 still on Level I, for that year, Plaintiff had 119 chargeable (but not all actionable) absences. [Campbell Aff. ¶ 9] Plaintiff's non-exempt absences that year triggered Level II action.[4]

- Entering 2000 on Level II, for that year, Plaintiff had 110 non-exempt absences. Plaintiff's non-exempt absences that year triggered Level III action. Plaintiff also had a total of 4 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

---

[3] Plaintiff should have been placed on Level II when she reached her sixth non-exempt day of absence, but was not.

[4] Plaintiff's should have progressed to Levels III and IV.

- Entering 2001 on Level III, Plaintiff had 36 non-exempt absences, initially triggering Level IV action. This action was reversed because it was taken beyond the time period provided under the ACP.[5] Plaintiff also had a total of 60 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 2002 on Level III, Plaintiff had 13.5 non-exempt absences, and should have been moved to Level IV, but inadvertently was not. Plaintiff also had a total of 27 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

- Entering 2003 on Level III, Plaintiff had six non-exempt absences — triggering Level IV and Level V action. Plaintiff also had a total of 16.5 exempt absences for FMLA leave she took that year, none of which were counted against her. [Campbell Aff. ¶ 9]

In summary, from 1996 through 2003, Plaintiff had a total of 503.5 non-exempt, chargeable absences. During this same period of time, Plaintiff requested and was granted at least seven leaves of absence under the FMLA, for a combined total of 285.5 days off from work. [Campbell Aff. ¶ 10; Gould T. 47-48] Not one of these FMLA absences counted toward or triggered any action against Plaintiff under the ACP. [Campbell Aff. ¶ 10; Gould T. 47]

In addition to the counseling she received each time she progressed to a higher level under the ACP, at the end of each year, Plaintiff also received an "End of Year Status Review," where she was counseled about her attendance record and the level of action against her. [Campbell Aff. ¶ 11; Gould T. 98]

---

[5] Lucent must take action within 30 calendar days after the employee returns from that absence. [See Exhibit A to Campbell Aff., 9-17]

C.    **Plaintiff's Termination of Employment for
      <u>Non-Exempt, Chargeable Absences in 2003</u>**

Plaintiff entered 2003 on Level III. [Gould T. 52]  Under the ACP, the next non-exempt, chargeable absence exceeding four days in 2003 would progress Plaintiff to Level IV. [Campbell Aff. ¶ 12]  Further, the next non-exempt, chargeable absence after that in 2003 would result in Level V action – probation or termination. [<u>Id.</u>]

1.    <u>**Level IV Action**</u>

On January 6-8, 2003, Plaintiff was absent from work for three days. [Gould T. 52-53]  These absences did not fall under any of the exclusions contained in the ACP and were counted toward Plaintiff's four day allotment. [Gould T. 52-53]

From March 3-28, 2003, Plaintiff was out for approximately three and one-half weeks. [Campbell Aff. ¶ 14]  As this leave of absence was requested and granted under the FMLA, none of this time was counted against Plaintiff. [Gould T. 53]

On May 5-6, 2003, Plaintiff missed an additional two days of work.  Plaintiff claimed that these May absences were taken pursuant to the FMLA and, therefore, were non-chargeable. [Gould T. 56]  More specifically, Plaintiff claimed she had to miss two days of work to care for her daughter, who was home sick with the chicken pox. [Gould T. 54, 65]  Plaintiff's daughter saw the doctor only once when ill with the chicken pox. [Gould T. 54]

On May 7, 2003, Plaintiff's supervisor, Brian Ahern ("Ahern"), informed Plaintiff that she needed to provide FMLA documentation within 15 days in order to qualify her May absences as FMLA leave. [Ahern Aff. ¶ 4]  Mr. Ahern informed Plaintiff that she would progress to Level IV if Plaintiff's leave failed to qualify under the FMLA, as this two day absence (if non-exempt) placed Plaintiff over her four day allotment. [Ahern Aff. ¶ 4]

While Plaintiff completed and provided Lucent with FMLA paperwork within the 15-day time frame, the documentation was vague, merely indicating that Plaintiff was absent due to a one-day illness of her daughter, which was neither chronic nor required additional treatment. [Blumer Aff. ¶ 4, Exhibit A; Gould T. 57-59, 65]

As this documentation did not support a determination that Plaintiff's daughter suffered from a "serious health condition" within the meaning of the FMLA, e.g., was ill for more than three consecutive days, on or around May 23, 2003, Peggy Blumer ("Blumer"), Lucent Benefit Delegate, asked Plaintiff to submit additional information concerning her daughter's illness. [Blumer Aff. 4; Gould T. 60-61]  At that time, Lucent had not yet denied Plaintiff's request for FMLA leave. [Blumer Aff. ¶ 4]

To further assist Plaintiff in qualifying her leave under the FMLA, Plaintiff's supervisor, Pyong Deletis ("Deletis") personally contacted Blumer, inquiring whether she could do anything to help Plaintiff. [Deletis T. 32]  Blumer informed Deletis, "just make sure she provides all the documentation that is necessary." [Deletis T. 32]  Deletis communicated this to Plaintiff, stressing the importance of providing detailed information so that she could get her FMLA leave approved. [Deletis T. 32]

While Plaintiff provided Lucent with this additional paperwork, it too failed to establish that her daughter suffered from any serious medical condition. [Blumer Aff. ¶ 6, Exhibit B; Gould T. 57-59, 65]  As a result, Lucent:  (i) disqualified Plaintiff's May 5-6, 2003 leave under the FMLA for failure to meet the criteria of a "serious health condition;" and (ii) progressed Plaintiff to Level IV under the ACP, for which she received a final warning. [Blumer Aff. ¶ 6, Exhibit C; Campbell Aff. ¶ 15, Exhibit B]

2.    **Level V Action**

On July 7, 2003, Plaintiff missed an additional day of work to care for her daughter, who was home from school <u>one day</u> with conjunctivitis. [Gould T. 65, 72]

The following day, on July 8, 2003, Plaintiff's supervisors, Steve Sickel (Sickel"), Deletis, and Ahern, met with Plaintiff to discuss her May absences. [Ahern Aff. ¶ 7; Gould T. 67-70] She was informed that she needed to contact her medical provider to resolve the status of her May leave. [Ahern Aff. ¶ 7] She was further informed that if she could not successfully demonstrate that her May leave qualified under the FMLA, and overturn Lucent's prior determination concerning this leave, she would progress to Level V for her subsequent July 7 non-exempt absence, which could result in termination of her employment. [Ahern Aff. ¶ 7; Gould T. 70] At that time, Plaintiff had not submitted any paperwork demonstrating that her daughter's conjunctivitis qualified under the FMLA.

Following this meeting, on or around July 11, 2003, Plaintiff, for the third time, submitted additional medical certification concerning her daughter's two-day illness in May. [Blumer Aff. ¶ 7; Exhibit D; Gould T. 68] This additional documentation, however, again fell far short of the FMLA's standard requiring a period of incapacity (<u>i.e.</u>, inability to work, attend school, et al.) of **more** than three consecutive days. The certification stated that: "Ms. Gould's daughter was being treated for chicken pox" and could not go to school for <u>two</u> days. [Blumer Aff. ¶ 7, Exhibit D; Gould T. 72] Because this certification failed to establish that Plaintiff's daughter suffered from any condition lasting more than three consecutive days, by letter dated July 14, 2003, Lucent sustained its determination that Plaintiff's leave failed to qualify under the FMLA. [Blumer Aff. ¶ 7, Exhibit E]

On July 25, 2003, in jeopardy of losing her employment, Plaintiff attempted to qualify her one day leave on July 7, 2003 under the FMLA by providing to Lucent, for the first

time, FMLA documentation.  [Blumer Aff. ¶ 8, Exhibit F]   The documentation stated that "patient needed to miss work on Monday, July 7, 2003 to stay home with her daughter, who had bacterial conjunctivitis and was contagious" and "needed to be kept home for 24 hours." [Blumer Aff. ¶ 8, Exhibit F]  It further stated that the daughter's condition was neither chronic nor required additional treatments.  [Blumer Aff. ¶ 8, Exhibit F]  By letter dated July 28, 2003, Lucent informed Plaintiff that her July 7 leave did not qualify under the FMLA.  [Blumer Aff. ¶ 8, Exhibit G]  Consequently, on July 30, 2003, Plaintiff was placed on Level V.  [Campbell Aff. ¶ 16, Exhibit C]

The next day, Plaintiff's Level V action was submitted to the Board for a determination of whether her employment should be terminated.    [Campbell Aff. ¶ 17]  Considering Plaintiff's prior attendance record, and all her previous warnings and counseling, the Board decided to terminate Plaintiff's employment.   Effective August 1, 2003, Plaintiff's employment was terminated for unsatisfactory attendance.  [Campbell Aff. ¶ 17, Exhibit D]

On September 19, 2003, in response to the termination, and as a final attempt to resolve the status of the May and July, 2003 leaves, Plaintiff provided Lucent once again with additional documentation concerning the reasons for the absences, including a letter from her daughter's school dated September 18, 2003.  [Blumer Aff. ¶ 9, Exhibit H]  The letter from the school stated, among other things, that in connection with her chicken pox, "Shelby was only absent for 2 days before she was cleared to return to school...." [Id.]  In connection with the conjunctivitis, the letter stated that "Shelby missed one day of school when she contracted conjunctivitis last July." [Blumer Aff. ¶ 9, Exhibit H; Gould T. 86]

After careful review of these most recent documents, Lucent denied Plaintiff's request to qualify the May leave under the FMLA for the final time and sustained her job termination. [Blumer Aff. 9, Exhibit I]

**D.      Plaintiff Was Not Eligible for Any Time Off Under the SNLA**

Contrary to the allegations in her Complaint, Plaintiff did not have any remaining time under the SNLA.

Under Lucent's policy, employees are given five "Excused Work Days" ("EWD"), one of which is designated by Lucent – Columbus Day. [Campbell Aff. ¶ 18, Exhibit E] Recognizing "that it may be in the best interest of employees to have the ability to take time off for brief intervals because of personal, immediate needs," Lucent allows up to four of these days to be used in increments of two hours. [Id.]

Under the SNLA, these EDWs are a substitute for leave under this State Statue. [Campbell Aff. ¶ 18]; see also Mass Gen. Laws ch. 149, § 52(D)(c) ("an eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for any of the leave" during any twelve month period).

By the time of Plaintiff's May 2003 absence, she had used all of her EWDs, with the exception of the company-wide designated EWD – Columbus Day. [Campbell Aff. ¶ 19] As Plaintiff had no EWDs remaining, assuming her leave was for a SNLA qualifying purpose (which Defendant asserts it was not), Plaintiff was ineligible for any leave under the SNLA.

**E.      Plaintiff Did Not Grieve Any Disciplinary Action Under the ACP**

At all times through the disciplinary process, Plaintiff was continuously represented by her Union and had access to comprehensive grievance procedures (up to and including, final and binding arbitration) under the CBA should she disagree with any of the

disciplinary actions taken against her. [Campbell Aff. ¶ 20, Exhibit F] Despite the repeated counseling and warnings she received as she progressed though the five levels, and having her Union Steward, and/or the option of having the Union Steward, present during such actions, Plaintiff never filed a grievance over any action until her employment was terminated. [Campbell Aff. ¶ 20]

Even then, Plaintiff never fully exhausted the grievance procedures under the CBA. [Campbell Aff. ¶ 20] Instead, with her Union's guidance, in or around January 2004, Plaintiff filed a claim with the United States Department of Labor ("DOL"), claiming a violation of the FMLA. [Blumer Aff. ¶ 10] On March 16, 2004, after a thorough investigation, including interviewing witnesses and reviewing the records concerning Plaintiff's attendance, the DOL dismissed her FMLA claims, finding no violation of the law. [Blumer Aff. ¶ 10]

Upon information and belief, Plaintiff never filed any complaint with the Attorney General's Office concerning her SNLA claims. [Blumer Aff. ¶ 10]

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF'S REQUESTS FOR LEAVE IN MAY AND JULY 2003 WERE NOT FMLA QUALIFYING

The FMLA only covers childcare leave if the child has a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). A serious health condition means "an illness, injury, impairment or physical or mental condition that involves ... [a] period of incapacity (i.e., inability to work, attend school ...) of **more than three consecutive days**...." 29 C.F.R. § 825.114(a). See Navarro v. Pfizer Corp., 261 F.3d 90 (1st Cir. 2001); Evans v. Henderson, No. 99 C 8332, 2001 WL 109771 (N.D. Ill. Feb. 5, 2001) (denying Plaintiff FMLA leave to care for

his children, who were sick with the chicken pox, because the period of incapacity was not more than three days and the evidence demonstrated that babysitting problems were the reasons for the absences.)

The individual must have also received "continuing treatment." This involves "[t]reatment two or more times by a health care provider" or "treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health car provider." 29 C.F.R. § 825.114(a)(2)(i). A "regimen of continuing treatment" includes "a course of prescription medication (e.g., an antibiotic)," but not "over-the-counter medications, such as aspirin, antihistamines...." 29 C.F.R. § 825.114(b).

As demonstrated by documentation submitted by Plaintiff herself, her daughter's conditions failed to meet the definition of a serious health condition. In connection with the chicken pox, Plaintiff's daughter missed only two days of school in May 2003. [Gould T. 54] Plaintiff experienced no complications with this illness "just the normal time of going through the stage of it, itchiness and irritation and fever." [Gould T. 79] Because Plaintiff failed to provide any documentation establishing that her daughter was ill with the chicken pox for more than three consecutive days, Plaintiff cannot qualify for FMLA leave for this illness. Further, Plaintiff's daughter did not receive treatment two or more times by a doctor for her chicken pox. As Plaintiff testified at her deposition, Plaintiff's daughter saw the doctor only once. [Gould T. 54] Nor was there any regimen of continuing treatment (e.g., prescriptive drugs).

As stated in a December 12, 1996 opinion letter issued by the United States Department of Labor, employees who occasionally stay home for a week or more with a child who has chicken pox, but has no complications related to the illness, are not entitled to leave

under the FMLA.  The rationale is that there is "no continuing treatment by a health provider that would qualify the absence for FMLA leave."  [Ruderman Aff. ¶ 4, Exhibit D]

Plaintiff's daughter, in connection with her conjunctivitis, missed only one day of school in July 2003, and Plaintiff has submitted no documentation demonstrating any condition lasting more than three consecutive days.  Accordingly, as a matter of law, Plaintiff's daughter's illnesses were not FMLA qualifying conditions and her FMLA leave requests were properly denied.

**POINT II**

**PLAINTIFF'S ABSENCES DID<br>NOT QUALIFY UNDER THE SNLA**

**A.     Plaintiff is Barred from Prosecuting this Cause of Action<br>Because, Upon Information and Belief, Plaintiff Failed to<br>File a Complaint with the Massachusetts Attorney General's Office**

Under the SNLA, an employee claiming a violation of this law may only bring a private cause of action "at the expiration of ninety days <u>after</u> the filing of a complaint with the attorney general, or sooner, if the attorney general assents in writing, and within three years of such violation."  Mass Gen. Laws ch. 149, § 150.[6] (emphasis added).

Because it appears that Plaintiff never filed a complaint with the Attorney General's Office concerning allegations that Lucent violated the SNLA – an administrative prerequisite to bringing her claim before this Court – Plaintiff's SNLA claim must be dismissed as a matter of law.  Moreover, should Plaintiff now first file a claim with the Attorney General's Office and subsequently with this Court, such claims would be time barred under the statute's three year statute of limitations.  Mass Gen. Laws ch. 149, § 150.  The latest act alleged in

---

[6] This Section is made applicable to the SNLA through Mass. Gen. Laws ch. 149, § 52(D)(f) ("Violation of this section shall be subject to the second paragraph of section 150 and to section 180.")

violation of this statute occurred on August 1, 2003 (Plaintiff's termination of employment date for her July 7, 2003 absence) -- more than three years ago.

**B.**    **Plaintiff Utilized All the Time Provided Under the SNLA**

As is permitted under the SNLA, Lucent employees substitute their personal leave with any of the leave provided under the SNLA.  See also Mass Gen. Laws ch. 149, § 52(D)(c) ("an eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for any of the leave" during any twelve month period).  Here, Plaintiff had utilized all of her personal days in 2003, which were used in lieu of time off under the SNLA.

**C.**    **Plaintiff's May and July 2003 Absences Do Not Fall Under Any of the Purposes for Which  SNLA Leave May Be Granted**

In addition to the 12 weeks allowed under the FMLA, under the SNLA, 24 hours of leave may be taken by an employee for the following purposes:

(1)    to "participate in school activities directly related to the educational advancement of a son or daughter of the employee, such as parent-teacher conference or interviewing for a new school;"

(2)    to "accompany the son or daughter of the employee to routine medical or dental appointments, such as check-ups or vaccinations;"

(3)    to "accompany an elderly relative of the employee to routine medical or dental appointments or appointments for other professional services related to the elder's care, such as interviewing at nursing or group homes."

See Mass. Gen. Laws ch. 149, § 52D(b).

Here, Plaintiff alleges she was entitled to up to 24 hours of time off from work in May and July, 2003 to take her daughter to the doctor.  See Mass. Gen. Laws ch. 149,

§ 52(D)(b)(2).  Assuming Plaintiff brought her daughter to the doctor, the purpose of the medical appointment was not "routine" within the unequivocal meaning of the SNLA, as the medical appointments were not for the purpose of a "check-up" but rather for treatment of the chicken pox and conjunctivitis.

Moreover, the time taken off for the doctor visits, assuming she went, accounted for only a fraction of the three days of time taken off by Plaintiff to stay home and care for her daughter in May and July.  Plaintiff testified that her daughter's doctor's office was only ten minutes from her house and that the doctor spent only 15 minutes examining her daughter. [Gould T. 54-55, 66]  The remaining time was spent taking care of her daughter at home.  [Gould T. 56]  Because time off for childcare is not one of the stated purposes for the SNLA leave, it is not protected under this statute.  Mass. Gen. Laws ch. 149, § 52D(b).

Based on the foregoing, Plaintiff cannot demonstrate that any of her time off in May and July 2003 was covered under the SNLA, and her claims should be dismissed.

## POINT III

### PLAINTIFF CANNOT ESTABLISH A CLAIM OF RETALIATION

To establish a <u>prima facie</u> case of retaliation under the FMLA, Plaintiff must demonstrate:  (1) that she participated in a protected activity; (2) the employer took adverse employment action against the Plaintiff; and (3) there is a causal connection between the protected activity and the adverse action.  <u>Hillstrom v. Best Western TLC Hotel</u>, 265 F. Supp. 2d 117 (D. Mass. 2003), <u>aff'd</u>, 354 F.3d 27 (1st Cir. 2003).

In her Complaint, Plaintiff alleges that Lucent retaliated against her for taking time off under the SNLA and FMLA, despite her eligibility.  However, because neither leave

qualified under either statute, Plaintiff cannot establish that she engaged in any protected activity – the first prong of her prima facie case.

Courts repeatedly dismiss retaliatory discharge claims under the FMLA where the employee cannot establish qualification for FMLA leave, and, accordingly, that he or she availed himself/herself of a protected right under the FMLA. Schmittou v. Wal-Mart Stores, Inc., No. Civ. 011763 (JRT/RLE), 2003 WL 22075763 (D. Minn. Aug. 22, 2003); Collins v. Merck-Medco RX Servs., of Texas, L.L.C., No. 200CV1852-X, 2001 WL 1142794 (N.D. Tex. Sept. 24, 2001); see also Nagy v. Tee Vee Toons, Inc., No. 03 Civ. 7838 (LAK), 2004 WL 1059512 (S.D.N.Y. May 12, 2004); Evans v. Henderson, No. 99 C 8332, 2001 WL 109771 (N.D. Ill. Feb. 5, 2004) (denying plaintiff's retaliation claim because employee could not establish protected activity status for the care of his sick children, who had the chicken pox).

Moreover, Plaintiff's retaliation claim is completely belied by the facts that: (i) she had requested and was granted at least seven previous FMLA leaves of absence, none of which were counted against Plaintiff's attendance record under the ACP, and (ii) Lucent gave Plaintiff four separate opportunities to present proper documentation establishing that her May leave qualified under the FMLA. Each and every document Plaintiff provided to Lucent was carefully reviewed and considered by Lucent in determining that Plaintiff did not qualify for leave in May under the FMLA.

## POINT IV

### PLAINTIFF'S CLAIMS OF WRONGFUL TERMINATION AGAINST PUBLIC POLICY ARE BARRED BY THE FMLA AND SNLA

It is well established Massachusetts law that if a statute already exists to protect a public policy, a plaintiff may not recover for a common law claim that he or she was wrongfully

terminated in violation of that public policy. Melley v. Gillette Corp., 475 N.E.2d 1227 (Mass. Ct. App. 1985), aff'd, 491 N.E.2d 252 (Mass. 1986); McCone v. New England Tel. & Tel. Co., 471 N.E.2d 47, 50 (Mass. 1984); Romaine v. Quabaug Corp., No. Civ. A. 04-1239A, 2004 WL 3090175 (Mass. Super. Ct. Dec. 17, 2004); Mayo v. Dalbar, Inc., Civil No. 99-6276, 2002 WL 1020725 (Mass. Super. Ct. Apr. 19, 2002).

In Melley, the plaintiff sued his former employer for age discrimination.  In denying plaintiff's public policy claims, the court held that: "[t]he difficulty with Melley's argument is that a finding that certain conduct contravenes public policy does not, in itself, warrant the creation of a new common law remedy for wrongful dismissal by an employer. … [W]here … there is a comprehensive remedial statute, the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme." 475 N.E.2d at 1228-1229.

Because both the FMLA and SNLA provide a broad statutory scheme for prohibiting wrongful termination of employees who exercise their rights under the statute, Plaintiff's claim of wrongful termination, which she also pursues under both the FMLA and SNLA, are barred.

## POINT V

### PLAINTIFF'S CLAIMS FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ARE BARRED BY THE EXCLUSIVITY PROVISIONS OF THE WORKERS' COMPENSATION ACT

The WCA bars common law claims of intentional and negligent infliction of emotional distress arising out of, and in the course of, an employee's employment, including his or her termination of employment. Lennon v. Walsh, 798 F. Supp. 845, 848 (D. Mass. 1992)

(exclusivity provision of the WCA precluded union official from recovering against union benefit plans for intentional infliction of emotional distress; official's allegation that he was removed from employment for improper reason did not take claim outside of scope of the WCA. Claims for "emotional distress resulting from employment termination, wrongful or otherwise, are precluded by [the exclusivity provision [of the WCA].") (citation omitted); Parisi v. Trustees of Hampshire Coll., 711 F. Supp. 57, 63 (D. Mass. 1989); Doe v. Purity Supreme, Inc., 664 N.E.2d 815 (Mass. Super. Ct. 1996) (exclusivity provision of the WCA precludes action against employer for negligent and intentional infliction of emotional distress arising out of, and in the course of, employment); Green v. Wyman-Gordon Co., 664 N.E.2d 808 (Mass. Super. Ct. 1996) (former employee's claims against former employer for intentional and negligent infliction of emotional distress arising out of alleged sexual harassment by co-employee barred by the exclusivity provision of the WCA).

Because Plaintiff's emotional distress claims are alleged to have arisen out of, and in the course of, her employment, or termination of employment, at Lucent, they are barred by the exclusivity provisions of the WCA and must be dismissed as a matter of law.

## CONCLUSION

Based on the foregoing, it is clear this litigation is wholly without merit and should be dismissed in its entirety.

Dated:     New York, New York
         August 18, 2006

                         Respectfully submitted,

                         EPSTEIN BECKER & GREEN, P.C.

                         By:    /Robyn Ruderman               
                                   Evan J. Spelfogel (474440)
                                   Robyn Ruderman (admitted pro hac vice)
                         250 Park Avenue
                         New York, New York  10177-1211
                         (212) 351-4500
                         Attorneys for Defendant