Evan J. Spelfogel (474440)
Robyn Ruderman (Admitted *pro hac vice*)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
Attorneys for Defendant
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LUANN P. GOULD,

                     Plaintiff,

      – against –

LUCENT TECHNOLOGIES, INC.,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORIGINAL FILED VIA ECF

05 CV 11118 (PBS)

**AFFIRMATION OF ROBYN RUDERMAN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK    )
                        )  ss.:
COUNTY OF NEW YORK )

     **ROBYN RUDERMAN**, an attorney duly licensed to practice law in the State of New York, affirms under penalty of perjury as follows:

     1.     I am an Associate of Epstein Becker & Green, P.C., counsel to Lucent Technologies, Inc. ("Lucent")  This Affirmation is submitted in support of Lucent's Motion for Summary Judgment.  All documents attached hereto are true and correct copies of the originals.

     2.     On or about May 10 2005, Plaintiff Luann Gould, filed her complaint in federal court alleging that Lucent terminated her employment in violation of the Federal Family and Medical Leave Act and the Massachusetts Small Necessities Leave Act.  A Copy of the Complaint is annexed hereto as Exhibit A.

3.      Pertinent pages from the Deposition Transcript of Luann Gould is annexed hereto as Exhibit B.

4.      Pertinent pages from the Deposition Transcript of Pyong Deletis is annexed hereto as Exhibit C.

5.      A copy of the December 12, 1996 Opinion letter issued by the United States Department of Labor ("DOL") is annexed hereto as Exhibit D.

**WHEREFORE**, I respectfully request that the Court grant Lucent's motion for summary judgment in its entirety.

Dated: New York, New York
       August 18, 2006

                        s/Robyn Ruderman
                        Robyn Ruderman

**EXHIBIT A**

**(to Affirmation of Robyn Ruderman in Support
of Defendant's Motion for Summary Judgment)**

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* - TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. 05-500C

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office.

Gould
..................................................................................................., Plaintiff(s)

v.

Lucent Technologies, Inc.
......................................................................, Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon _____ Attorney Linda A. Harvey _____,

plaintiff's attorney, whose address is _184 Pleasant Valley Street, Methuen, MA_ an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

_Lawrence Superior Ct_ either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, SUZANNE V. DelVECCHIO, Esquire, at Salem, the
day of                                        , in the year of our Lord two thousand

**FILED**
IN THE SUPERIOR COURT
FOR THE COUNTY OF ESSEX

MAY 2 5 2005

*Thomas H. Driscoll Jr.*

*Thomas H. Driscoll Jr.*
CLERK

A TRUE COPY
*Rosa M. Cottard*
DEPUTY ASST. CLERK    TEST
Clerk

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

## COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF THE TRIAL COURT

ESSEX, ss.

SUPERIOR COURT
C.A. No. 2005-500-C

| | |
|---|---|
| LUANN P. GOULD, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LUCENT TECHNOLOGIES, INC., | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

The plaintiff, Luann P. Gould ("Gould") hereby respectfully submits her

Complaint against the Defendant, Lucent Technologies, Inc., ("Lucent") and Gould's

demand for a trial by jury of all issues so triable.

### Nature of Complaint

1.      This is an action by Gould against her former employer, Lucent Technologies,

Inc. for violating provisions of the Family and Medical Leave Act (FMLA)

and the Small Necessities Leave Act (SNLA).  Lucent denied Gould's

qualifying requests for leave under FMLA.  Shortly thereafter, Lucent

terminated Gould on August 1, 2003 for excessive absenteeism.  This

Complaint includes counts for violations of the FMLA and SNLA; retaliation

under the FMLA and SNLA; wrongful termination against public policy;

negligent infliction of emotional distress; and intentional infliction of

emotional distress.

A TRUE COPY ATTEST

*[signature]*

DEPUTY ASST. CLERK

1

<u>Parties</u>

2.      Luann P. Gould ("Gould") is an individual residing at 14 Billy's Way,

Danville, New Hampshire.

3.      Lucent Technologies, Inc. ("Lucent") is a corporation having a usual place of

business at 1600 Osgood Street, North Andover, Essex County,

Massachusetts.

<u>Facts</u>

4.      Gould was hired to work at Lucent on October 16, 1979.  Gould worked at

Lucent continuously until she was terminated on August 1, 2003.

5.      Gould's daughter, Shelby Gould, was born on July 22, 1997.  In 1997, Gould

suffered from kidney failure due to her pregnancy.

6.      On August 6, 1997, Gould was hospitalized for conjunctive heart failure.

7.      In 1998, Gould had kidney surgery.

8.      Gould was absent from work for extensive periods of time from 1996 through

1998 due to her pregnancy, health complications, and surgery.

9.      Gould requested and was approved for FMLA time off from work during

these years.

10.     Despite the FMLA leave time granted, Gould was written up under Lucent's

absenteeism policy because her medical conditions required she be out of

work for more than 12 weeks each year during the years 1996, 1997, and

1998.

11.    In all relevant years, Lucent used an absenteeism policy for any given year which involved counting absences for the prior three years, irregardless of whether the absences were due to serious medical conditions.

12.    Lucent's absenteeism policy involved a probationary rating system of Level 1 (best) to Level 5 (worst).

13.    For the period March 3 through March 28, 2003, Gould requested and received FMLA leave.

14.    On May 5 through May 7, 2003, Gould requested FMLA leave because she needed to take her daughter, age 5, to a medical appointment.  Gould's daughter was diagnosed with chicken pox, was contagious, needed care, and could not be left in daycare.

15.    Gould's request for leave was not foreseeable on May 5, 2003, and Gould provided notice as soon as practicable.

16.    Gould is a single mother, and is the sole caregiver for her daughter.

17.    Gould was eligible for FMLA time off for her daughter's chicken pox in May, 2003.

18.    Gould was concurrently eligible for time off from work under the Mass. Small Necessities Leave Act (SNLA).

19.    No one from Lucent notified Gould that she was eligible for SNLA time off.

20.    On July 7, 2003, Gould's daughter had an eye infection, required a doctor's visit, and required antibiotic ointment.  Gould's daughter had conjunctivitis, which is highly contagious.

21.    Gould's request for leave on July 7, 2003 was not foreseeable.

3

22. Gould contacted her supervisor, Pyong Deletis, at Lucent and advised her about the doctor's visit for her daughter, the treatment, and that her daughter was contagious for 24 hours.

23. As Gould was the only person available to care for her daughter, she told Deletis she would need to stay home on July 7, 2003.

24. On July 7, 2003, Peggy Blumer, Benefits Manager at Lucent denied Gould's prior request for FMLA leave for May 5-7, 2003.

25. Gould returned to work on July 8, 2003.

26. Gould submitted FMLA paperwork to Lucent on July 14, 2003 for July 7, 2003.

27. Gould's request for FMLA time off for July 7, 2003 was denied in late July.

28. The 2 denials of FMLA time off resulted in Gould' termination on August 1, 2003 due to unauthorized absences.

29. As of August 1, 2003, Gould had accrued 4 hours of vacation time.

30. Blumer denied Gould's request for FMLA time off in May and July, 2003 because "Childhood illness does not qualify under FMLA, unless there are complications."

31. Blumer told Gould's supervisor that she (Blumer) would have denied Gould's prior requests for FMLA time off in March, 2003 that had been approved by others in Lucent's benefits office.

4

<u>Count I</u>

<u>Violation of Family and Medical Leave Act</u>

32.    Gould hereby repeats and incorporates herein by reference each and all of the

allegations set forth above.

33.    Lucent was a qualified FMLA employer.

34.    Gould was an eligible FMLA employee for the calendar year 2003.

35.    Gould had approximately 8 weeks of FMLA time remaining in 2003, after

approved time taken in March, 2003.

36.    Lucent's denial of FMLA time off for May, 2003 and July, 2003 was

unfounded and erroneous.

37.    Lucent's denial of FMLA time off directly resulted in its decision to terminate

Gould on August 1, 2003.

<u>Count II</u>

<u>Violation of M.G.L. c. 149 s. 52D (SNLA)</u>

38.    Gould hereby repeats and incorporates herein by reference each and all of the

allegations set forth above.

39.    Lucent was a qualified SNLA employer.

40.    Gould was a qualified SNLA employee.

41.    Gould was eligible for up to 24 hours of leave in calendar year 2003 in order

to accompany her daughter to routine medical or dental appointments, such as

checkups of or vaccinations.

42.    Under the SNLA, Lucent was required to afford up to 24 hours of leave time

to Gould even if Gould did not request it under the statute's name.

5

43. Lucent did not advise Gould of her rights to time off under the SNLA.

44. Lucent denied FMLA time off to Gould, which would have qualified as SNLA time off.

45. Lucent never offered SNLA time off to Gould.

46. Lucent's preclusion of Gould taking SNLA time off violated the SNLA and directly led to Gould's termination on August 1, 2003.

<u>Count III</u>

<u>Retaliation under the FMLA</u>

47. Gould hereby repeats and incorporates herein by reference each and all of the allegations set forth above.

48. Lucent's Benefits Manager erroneously denied Gould's requests for FMLA time off.

49. Lucent Managers changed Gould's absenteeism status from Level 4 to Level 5 after the denial of FMLA time off.

50. Gould was terminated on August 1, 2003, shortly after Lucent's denial for time off for July 7, 2003.

51. Lucent refused to reconsider its position at a grievance hearing held after Gould's termination.

52. Lucent retaliated against Gould for attempting to take time off under the FMLA, despite her eligibility.

<u>Count IV</u>

<u>Retaliation under the SNLA</u>

53.   Gould hereby repeats and incorporates herein by reference each and all of the allegations set forth above.

54.   Lucent's Benefits Manager erroneously did not consider Gould's requests for leave under the Small Necessities Leave Act (SNLA).

55.   Gould was terminated on August 1, 2003, shortly after Lucent's denial of time off for July 7, 2003 and May 5-7, 2003..

56.   Lucent refused to reconsider its position at a grievance hearing held after Gould's termination.

57.   Lucent retaliated against Gould for attempting to take time off under the SNLA, despite her eligibility.

58.   Lucent's preclusion of Gould taking SNLA time off violated the SNLA and led to Gould's termination on August 1, 2003.

Count V

Wrongful Termination Against Public Policy

59.   Gould hereby repeats and incorporates herein by reference each and all of the allegations set forth above.

60.   Gould was terminated for excessive absenteeism.

61.   The absences which directly resulted in Gould's termination were absences on May 5-7, 2003 and July 7, 2003.

62.   Gould requested time off under the FMLA, and submitted paperwork and documentation to secure approval from Lucent for her absences from work.

63.   Lucent erred, and did not approve May 5-7, 203 and July 7, 2003 as qualifying time off under the FMLA or the SNLA.

64.  By requesting the time off for valid reasons, Gould attempted to assert a legally guaranteed right.

65.  Gould was terminated for attempting to assert a legally guaranteed right under state law and federal law.

66.  Gould has been harmed by Lucent's unlawful termination.


Count VI

Negligent Infliction of Emotional Distress

67.  Gould hereby repeats and incorporates herein by reference each and all of the allegations set forth above.

68.  Lucent was negligent in deciding whether Gould's requested time off qualified under the FMLA or the SNLA.

69.  Lucent's negligence caused Gould severe emotional distress.

70.  Gould's emotional distress either caused or was caused by physical harm or injury.

71.  Gould's physical harm or injury was manifested by objective symptomatology, such as nausea, head aches, stomach aches, increased anxiety, and sleeplessness.

72.  The emotional distress was foreseeable, i.e., a reasonable person would have suffered emotional distress under the same circumstances.

Count VII

Intentional Infliction of Emotional Distress

73.  Gould hereby repeats and incorporates herein by reference each and all of the allegations set forth above.

74.  Lucent acted in an extreme or outrageous manner in its personnel dealings with Gould.

75.  Lucent intended to cause emotional distress or should have known that emotional distress was likely to occur.

76.  Gould's emotional distress was severe such that no reasonable person could be expected to endure it.

77.  Lucent's actions resulted directly in Gould's severe emotional distress.

WHEREFORE, Gould respectfully prays that this Honorable Court enter judgment as follows:

1.  For Gould's damages including lost pay and benefits since August 1, 2003;

2.  For treble damages, under the FMLA and the SNLA, plus Gould's reasonable attorneys' fees, interest, and costs of suit; and

3.  Granting Gould such other and further relief as may be just and appropriate.

<u>JURY DEMAND</u>

Pursuant to Rule 38 of the Massachusetts Rules of Civil Procedure and all other applicable law, Gould claims a trial by jury as to all counts and issues so triable.

Respectfully submitted,

LUANN P. GOULD

By her attorney,


Linda Harvey BBO #547994
184 Pleasant Valley Street
Methuen, MA 01844
978-686-9800

Dated:  March 21, 2005

**EXHIBIT B**

**(to Affirmation of Robyn Ruderman in Support
of Defendant's Motion for Summary Judgment)**

Luann Gould

47

1  missed from work for any reason?

2      A.  I don't recall.  I may have.

3      Q.  Well, in 1997 you told us that you had

4  certain medical --

5      A.  Yes, yes.

6      Q.  You had the pregnancy and you had the kidney

7  and you had the heart and you had the tumor?

8      A.  Yeah, I was out of work in '97, I know that.

9      Q.  Would it surprise you if I were to tell you

10  the records show that in 1997 you had 86 absences

11  from work; in 1998, 134; in 1999, 119; in 2000, 116;

12  in 2001, 95 absences?

13      A.  No, it wouldn't surprise me.

14      Q.  During that period of time, a number of

15  those absences were covered, weren't they, by Family

16  Medical Leave Act, excused absences?

17      A.  Yes, between that and disability.

18      Q.  Before 2003, do you recall approximately how

19  many times you requested Family Medical Leave Act

20  absences?

21      A.  No, not offhand.

22      Q.  Half a dozen?

23      A.  From when, 1990 what?

24      Q.  1997, from the time -- the year in which you

Luann Gould

48

1   had Shelby.

2       A.  The worst year.

3       Q.  Up and before 2003.

4       A.  Yeah, there were several times I needed.

5       Q.  I'll call it FMLA, F-M-L-A, so I don't keep

6   saying Family Medical Leave Act.  FMLA leave.  Was

7   there ever any occasion that you asked for FMLA

8   leave and Lucent refused your request before 2003?

9       A.  In 2003 they refused it, but I don't believe

10  before.

11      Q.  I'm talking about before that.  You're

12  shaking your head --

13      A.  I don't believe so.

14      Q.  In early 2003, March of 2003, did you

15  request FMLA leave?

16      A.  Yes.

17      Q.  Was it granted?

18      A.  I believe it was.

19              MR. SPELFOGEL:  Off the record for a

20  minute.

21              (Discussion off the record)

22              (Whereupon, a recess was taken)

23              (Exhibit 4 marked for identification)

24      Q.  Are you familiar with the Lucent Absence

Luann Gould

49

1    Control Plan?  I'll call it the ACP.

2        A.   Somewhat.

3        Q.   Do you recall the fact that under an Absence

4    Control Plan, there are five levels, one, two,

5    three, four, five and degrees of seriousness?

6        A.   Yes.

7        Q.   What can you tell me about your recollection

8    about the five levels?

9        A.   That they exist.

10       Q.   What was level one, do you know?

11       A.   The first of the levels, first entry of the

12   level system.

13       Q.   Under the Absence Control Plan, you were

14   entitled to a certain number of absences per

15   calendar year, not counting excused absences; is

16   that right?

17       A.   Correct.

18       Q.   Do you remember what the number of absences

19   you were allowed in a year were, the unexcused

20   number you were allowed?

21       A.   I believe it was five days.

22       Q.   And do you recall what some of the absences

23   were that were not counted against your five days?

24   For example, vacations I imagine were not counted,

Luann Gould

50

1    correct?

2        A.   Uh-hum.

3        Q.   And FMLA leave was not counted, correct?

4        A.   Right.

5        Q.   And jury duty was not counted, correct?

6        A.   Correct.

7        Q.   Also not counted against these five days

8    were if you were hospitalized at a hospital,

9    correct?

10       A.   Correct.

11       Q.   And if you had daycare surgery, whether it

12   was in a hospital or a doctor's office, even though

13   you did not have to stay overnight, correct?

14       A.   Correct.

15       Q.   Funeral leave, right?

16       A.   Uh-hum.

17       Q.   And if you were required to appear in court,

18   correct?

19       A.   Correct.

20       Q.   Those were all not counted against your five

21   days?

22       A.   Yes.

23       Q.   Now, am I correct that if you had more than

24   five days of absences in a calendar year that were

Luann Gould

51

1   not exempted under this plan because they didn't

2   fall in the various categories that we just talked

3   about, you went to level one to begin with at the

4   beginning; is that right?

5       A.  Correct.

6       Q.  And once you went on level one, you got a

7   verbal warning; is that right?

8       A.  Yes.

9       Q.  And then if you start the year on level one

10  and you go over your five days allowed for that next

11  calendar year, you moved to level two?

12      A.  Correct.

13      Q.  And at level two, you get a written warning,

14  correct?

15      A.  Yeah, yes.

16      Q.  Then if you begin the year at level two and

17  you go over the -- at that point was it still five

18  days or was it down to four days?  Between level two

19  and three, it was four days, wasn't it?

20      A.  I am not sure.  I know it dropped as the

21  levels or years went on.  I believe it dropped.

22      Q.  Whether it was four days or five days, let's

23  say if you exceeded the allowed non-exempt days, you

24  then moved to level three and got some sort of more

Luann Gould

52

1    formal written warning?

2        A.   Yes.

3        Q.   Once you were on level three under the

4    Absence Control Plan and you got one more

5    non-exempted absence, you would move to level four?

6        A.   Correct.

7        Q.   And at level four, you'd be in effect given

8    a final warning and put on a probationary basis; is

9    that right?

10       A.   I believe so.

11       Q.   And then once you're on level four, if you

12   have one additional non-exempted absence during that

13   same calendar year, that's termination, correct?

14       A.   In some cases.  Some cases people have been

15   on level five and put on probation.

16       Q.   Now, when you began calendar year 2003, you

17   were already on level three, weren't you?

18       A.   I believe so.

19       Q.   And you were then absent in early January

20   2003 for several days of non-exempted absences.

21   January 6th, 7th and 8th you were out, did not claim

22   Family Medical Leave Act or any other qualifying or

23   exempting reason to be out those days, and those

24   were counted against your allowance; is that

Luann Gould

53

1    correct?

2        A.  Correct.

3        Q.  Then in 2003, you were out again in March,

4    March 3rd through March 28th, approximately three

5    and a half weeks.  But that was all a requested and

6    a granted FMLA leave; do you recall that?

7        A.  I don't recall being out that many days in

8    March at one time.

9        Q.  Do you recall being out in March, though, on

10   an FMLA leave situation?

11       A.  March I believe my daughter had bac -- I'm

12   not sure if she had strep throat or bacterial

13   infection.  It was one of them.  I was out for a few

14   days.

15       Q.  Do you remember being out in March and you

16   requested -- March 2003 for at least a few days and

17   you requested FMLA leave, it was granted, you just

18   don't remember the number of days?

19       A.  Correct.

20           MR. SPELFOGEL:  Just so the record is

21   clear, I've marked the Absence Control Plan as Gould

22   Exhibit Number 4.

23       Q.  You were then absent in May 2003 I believe

24   for two days; is that right?

Luann Gould

54

1    A.   Yes.

2    Q.   What was the reason why you missed work

3    those two days?

4    A.   My daughter had to be quarantined.  She had

5    chicken pox.

6    Q.   Did you take your daughter to see a doctor

7    for the chicken pox?

8    A.   Yes.

9    Q.   Which doctor?

10   A.   Dr. Cammerilla.

11   Q.   How many times?

12   A.   I just brought her in once, I believe, the

13   day of the -- I took her to her doctor visit.  I was

14   seeing if I had his card.

15   Q.   Did you take your daughter to the doctor

16   personally?

17   A.   Yes, yes.

18   Q.   How far away from your home was it to the

19   doctor's office?

20   A.   Like ten minutes.  It was in Hampstead.

21   Q.   You drove her?

22   A.   Correct.  I had to bring her in the back

23   door because of her contagiousness.  We couldn't go

24   into the front waiting room.

Luann Gould

55

1     Q.  So you didn't stay in the waiting room at

2  all?

3     A.  They opened up the back door for us to go in

4  that way.

5     Q.  How long were you at the doctor's with your

6  daughter?

7     A.  Maybe 15 minutes.

8     Q.  He examined your daughter?

9     A.  Yes.

10     Q.  Did he then prescribe anything?

11     A.  To give her baths with some type of a like a

12  baking soda type of wash, Aveeno, oatmeal Aveeno.

13     Q.  Did he tell you how long she had to stay out

14  of, was it child care at the time?  Was she at

15  Hampstead at the time?

16     A.  Yes, she was.

17     Q.  Did he tell you how long she should stay out

18  of Hampstead?

19     A.  Until the chicken pox had, I think he said

20  like they scabbed over for the healing for the

21  contagiousness period.

22     Q.  Did he tell you how many months, weeks or

23  days that might be?

24     A.  No, I believe that was a few days.

Luann Gould

56

1     Q.   Was this in the morning or the afternoon

2    that you went to the doctor's office?

3     A.   I don't recall exact time.

4     Q.   Did you go before going to work at Lucent or

5    after you came home?

6     A.   No, it was before, because I never went to

7    work that day.  When I called in the morning, they

8    open at nine, but I'm not sure what time the

9    appointment was.

10     Q.   You didn't go to work that day at all?

11     A.   I don't believe -- was it the fifth?

12     Q.   The fifth.

13     A.   I believe I was out on the fifth, sixth and

14    seventh, couple of days.

15     Q.   Were you out two days or three days?

16     A.   I don't recall offhand.  I know it was a few

17    days.

18     Q.   Did you request FMLA leave for that time

19    off?

20     A.   Yes.  Yes, I did.

21          MR. SPELFOGEL:  I'd like to mark this

22    Family and Medical Leave of Absence, FMLA

23    notification form as Gould Number 5.

24          (Exhibit 5 marked for identification)

Luann Gould

57

1    Q.  Did you sign this form on the first page in

2    the middle of the page?

3    A.  Yes.

4    Q.  What date did you sign that?

5    A.  I believe it's 5/7/03.

6    Q.  I'm looking at my copy, and it looks like it

7    was eight crossed out, and it looks like a one

8    before the seven?

9    A.  Uh-hum.  Wait a minute.

10   Q.  Is that your writing at the top of the form?

11   A.  Yes, that's my writing.

12   Q.  You filled out your name, your social

13   security number, your address and the other

14   information, the employment information at the top?

15   A.  Yes, correct.

16   Q.  And then in the middle of the page before we

17   get to your signature, there's another section to be

18   completed by the employee's supervisor.  Was that

19   Brian Ahern, your supervisor who filled that out?

20   A.  Correct.

21   Q.  And you signed it in the middle?

22   A.  Correct.

23   Q.  And then at the very bottom of that first

24   page to be completed by health service, do you see

Luann Gould

58

1    what it says there?  This FMLA is what?

2       A.   Is not qualified.

3       Q.   All right.  Can you tell who signed that?

4       A.   Yes, Peggy Blumer.

5       Q.   Who is Peggy Blumer?

6       A.   She's from New Jersey.  She works in the

7    health services department.

8       Q.   Employed by Lucent?

9       A.   Yes.

10      Q.   Now, the second page, who wrote that first

11   line, Greater Hampstead Family?

12      A.   I did, Luann.

13      Q.   And then you signed immediately after that?

14      A.   Correct.

15      Q.   And you dated it, May 7, '03?

16      A.   Correct.

17      Q.   Did you fill out the next few lines, item

18   one and item two?

19      A.   Yes, I did.

20      Q.   What about item -- the rest of the items?

21   Item three is not filled out.  Item four says -- I

22   think it says Luann was absent due to illness of her

23   daughter; is that correct?

24      A.   Correct.

Luann Gould

59

1    Q.   Is that your writing?

2    A.   No.

3    Q.   Do you know whether somebody at Greater

4    Hampstead Family filled that out?

5    A.   Yeah, that's the part they have to fill out.

6    Q.   And 5A, state the approximate date the

7    condition commenced, probable duration of the

8    condition and of the patient's present incapacity.

9    Can you see what that says?

10   A.   Yes.

11   Q.   Can you read it for us?

12   A.   It says began 5/7/03 and was expected to

13   return to normal activities on 5/7/03.  I'm not sure

14   if it's a nine or a seven.

15   Q.   And then item 5B, the box is circled or

16   checked no on whether it was necessary for the

17   employee to work intermittently or on less than a

18   full schedule; is that correct?

19   A.   Correct.

20   Q.   And then 5C says that the condition was not

21   chronic.

22   A.   Correct.

23   Q.   6A says additional treatments not required,

24   I believe.

Luann Gould

60

1    A.  Correct.

2    Q.  How many days was your daughter out of the

3  Hampstead, Greater Hampstead Family Center on

4  account of that chicken pox situation?

5    A.  From 5/5 to 5/8, I believe.

6    Q.  May 5, 2003, according to my perpetual

7  calendar, was a Monday.

8          MR. SPELFOGEL:  Is that what you have?

9          MR. THOMAS:  Yes.

10    Q.  After you submitted that paperwork, Gould

11  Exhibit 5, to Lucent's benefits people, were you

12  told anything with respect to the Family Medical

13  Leave Act qualification.

14    A.  I haven't -- I didn't hear nothing for

15  awhile, a long time.

16    Q.  How long is a while?

17    A.  That was in May.  I'm going to say at least

18  up until June before I got a call from Peggy Blumer

19  stating that the doctor's report was vague.

20    Q.  Did Peggy Blumer say anything else to you

21  about that?

22    A.  I believe she wanted me to contact the

23  doctor's office and have another FMLA sheet filled

24  out.

Luann Gould

61

1    Q.  Is it fair to say that she was encouraging

2  you to get more documentation or better

3  documentation to qualify that absence as FMLA

4  absence?

5    A.  She just stated that, just I said why did

6  you wait so long to call me.  And she said that -- I

7  don't remember what -- she just said that she didn't

8  have the proper or it was vague or couldn't read.

9  But when I had it redone, it was the same as the

10  first time.  So --

11    Q.  She said to you that the paperwork that came

12  back from the Hampstead Family Center was vague?

13    A.  Correct.

14    Q.  And she asked or suggested that you get more

15  information or have the form filled out again?

16    A.  The form filled out again.

17    Q.  And did you?

18    A.  Yes, I did.  I believe I did.

19    Q.  Let me show you another piece of paper I'm

20  going to mark as Gould Number 6 and ask you if you

21  can tell me what this is.

22       (Exhibit 6 marked for identification)

23    Q.  Can you tell me whether this was part of the

24  previous Exhibit Number 5, perhaps should be the

Luann Gould

65

1    had underlined that.  Did you underline that?

2        A.  No, I didn't.

3        Q.  Did somebody at Lucent underline that for

4    you?  It wasn't underlined in your presence?

5        A.  I don't recall it.

6        Q.  Were you out of work for more than three

7    consecutive calendar days because of your daughter's

8    condition in May of 2003?

9        A.  In May for the chicken pox?

10       Q.  Correct.

11       A.  I believe it was two days.

12       Q.  Were you out of work for more than three

13   consecutive calendar days in July 2003 because of

14   the conjunctivitis condition of your daughter?

15       A.  No.

16       Q.  Now, in July when your daughter had

17   conjunctivitis, did you take your daughter to the

18   doctor, also?

19       A.  Yes.

20       Q.  Was it to Dr. Cammerilla?

21       A.  Yes.

22       Q.  So that was about a ten-minute drive in each

23   direction; is that right?

24       A.  Correct.

Luann Gould

67

1  submitting documentation to Lucent concerning the

2  chicken pox situation?

3       A.  I'm not sure if it was once or twice.

4       Q.  Could it have been three or four times?

5       A.  I don't believe it was that many.

6       Q.  Do you recall after being told that you were

7  being terminated for excessive absenteeism August 1,

8  2003, that you were given another opportunity, even

9  after that, to get additional documentation from the

10 health care providers?

11      A.  I believe that was on the July 7th incident,

12 that they gave me the same FMLA paperwork that they

13 denied the first.

14      Q.  Do you recall having a meeting with either

15 Mr. Ahern or Ms. Deletis or other Lucent supervisors

16 concerning your absenteeism situation around July of

17 2003?

18      A.  When I came back after my daughter had the

19 conjunctivitis the following day, I believe that was

20 the day they were notified of the chicken pox

21 denial, and I believe that was the day I went on

22 level four was when I returned, because they had

23 already -- Peggy Blumer was aware of my absence

24 again.  That's the day she turned -- she denied the

Luann Gould

68

1  chicken pox from May on July 7th.

2      Q.  So you were told that the benefits people at

3  Lucent had determined that your absence in

4  connection with the chicken pox did not qualify as

5  an FMLA leave?

6      A.  Correct.

7      Q.  And you were given opportunities, at least

8  one, perhaps two additional opportunities, to try to

9  get additional and supplemental information to help

10 see if it could be qualified as FMLA leave, correct?

11     A.  I was given the same paperwork with the same

12 information, the antibiotic my daughter was on, the

13 care that she needed.

14     Q.  When you say given the same paperwork, you

15 mean by your health care provider?

16     A.  By Peggy Blumer, Lucent gave me the same

17 FMLA that I had already prior filled out.

18     Q.  The same forms?

19     A.  Correct.

20     Q.  Blank forms, new forms to take back to

21 Dr. Cammerilla to ask him to fill it out and give

22 you more information?

23     A.  I don't know about more, because it was the

24 antibiotic that she was being treated with which was

Luann Gould

69

1    stated on -- I don't know if it was anymore

2    information.  Basically it was the same.

3        Q.  Well, what the doctor gave you was the same.

4    But didn't either Peggy or other Lucent people

5    suggest that you go back to the doctor and have

6    them, have the doctor give you -- write it up in a

7    way that might help qualify it as Family Medical

8    Leave absence?

9        A.  It was the same.  I believe at the time they

10   had already determined that I was not going to

11   qualify.  It was just like a procedure to -- if they

12   were going to give me the right form, they would

13   have gave me the SNLA form.

14       Q.  On July 8th, do you remember meeting with

15   Steve Sickel?  By the way, who is Steve Sickel?

16       A.  He was the department chief.  I think that

17   was the day he left early.  When the chicken pock

18   level I went on, they had another department chief

19   sit in, because Steve Sickel wasn't going to be

20   available that day, and they wanted to put me on the

21   level that day then and there.  So they had Pyong

22   Deletis fill in for him.

23       Q.  And Brian Ahern was there?

24       A.  Correct.

Luann Gould

70

1    Q.  And Pyong Deletis was there?

2    A.  Correct.

3    Q.  Tell me what was said at that meeting.  Who

4  said what to whom?

5    A.  I guess they basically told me that the

6  chicken pock illness had been denied, and that, that

7  was going to put me on level four, the action taken

8  would put me on level four.

9    Q.  And in fact, didn't they also tell you that

10  you were out on July 7th, that you would be moved to

11  level five and be subject to termination unless you

12  could qualify that May absence as FMLA leave?

13    A.  That was the May absence when they put me

14  on, on 7/8.  The July 7th hadn't even been qualified

15  or not qualified at that time.  That was the

16  paperwork that was held back from May, from the

17  chicken pock that triggered level four.

18    Q.  That you go to level four, all right.

19  During that meeting were you told that you should go

20  back to your medical providers and try to get more

21  information or have the forms filled out in more

22  detail to see if you could qualify for FMLA leave

23  for the May absence?

24    A.  I don't recall that, sir.

Luann Gould

72

1   about helping me.  I know they had conversations

2   regarding to my absences.

3       Q.  How do you know that?

4       A.  I have seen, you know, e-mails that were

5   sent back and forth when the unions got copies of my

6   documentation.  I had seen e-mails of conversations

7   back and forth.  And Pyong told me herself on 7/7

8   when I called in that she had already called Peggy.

9       Q.  By the way, how many days was your daughter

10  actually out from the Hampstead School, Village

11  School because of the conjunctivitis?

12      A.  That Monday, because it was 24 hours for the

13  antibiotic.  So she was only out that Monday.

14      Q.  So you were out of work just that one day?

15      A.  Correct.

16              MR. SPELFOGEL:  Mark this as Gould

17  Exhibit 8.

18              (Exhibit 8 marked for identification)

19      Q.  Can you tell us what that document is, Gould

20  Number 8?

21      A.  Yes, that was from the doctor's office

22  stating that Shelby has been under his professional

23  care from 5/5 to 5/6 and may return to work on 5/7.

24  Daughter chicken pox, contagious -- because of

Luann Gould

79

1    Q.  Okay, thanks.  Now, did Shelby have any

2    complications at all from the chicken pox?

3    A.  Just the normal time of going through the

4    stage of it, itchiness and irritation and fever.

5    Q.  Nothing out of the ordinary, though?

6    A.  No.

7            MR. SPELFOGEL:  Mark this, please, this

8    July 28, 2003 letter to Ms. Gould as Gould Exhibit

9    Number 12.

10           (Exhibit 12 marked for identification)

11   Q.  Actually, I'm looking at what we've marked

12   as Gould Number 12.  It appears to be two separate

13   letters, one dated July 28, '03 from Peggy Blumer to

14   you with a copy to Ms. Deletis; and the second,

15   another letter the same day to Ms. Deletis from

16   Peggy Blumer referencing the first letter.  When you

17   received the -- did you receive the July 28th letter

18   from Ms. Blumer to you around that time?

19   A.  I believe so.

20   Q.  This is the letter informing you that your

21   absence on July 7th did not qualify under the Family

22   Medical Leave Act, correct?

23   A.  Correct.

24   Q.  Did you around that time then receive a

Luann Gould

86

1    A.  Yes.

2    Q.  And then I'm looking in the third paragraph

3   down and toward the middle of the page.  It says

4   Shelby was only absent for two days before she was

5   cleared to return to school.  That's the chicken pox

6   incident in May.  Then at the end of the letter it

7   says, Shelby missed one day of school for

8   conjunctivitis in July, correct?

9    A.  Correct.

10        MR. SPELFOGEL:  Mark this as Gould

11   Exhibit 15.

12        (Exhibit 15 marked for identification)

13    Q.  Now, as a result of the company receiving

14   what we've marked as Gould Exhibit 14, the

15   supplementary FMLA leave pages from the Hampstead

16   Medical Clinic and the September 18th letter from

17   the Hampstead Village Preschool, you then received a

18   September 25, 2003 letter from Peggy Blumer, which

19   we've marked as Exhibit 15; is that right?

20    A.  Correct.

21    Q.  I may have asked you this question before.

22   I apologize if I have.  Do you recall Ms. Deletis

23   ever suggesting to you that you contact Peggy Blumer

24   directly about this whole situation?

Luann Gould

98

1  terminated, my sister was extremely upset over the

2  fact that, that had happened.  And Gary went to

3  console her and she asked Gary, you know, "Why

4  wouldn't they give my sister the SNLA?"  His answer

5  to her was, "Because they wanted her fired."  That

6  was his answer.

7      Q.  And the person who gave that answer was who?

8      A.  Gary, the president of the union gave that

9  answer to my sister, "because they wanted her

10  fired."

11          MR. SPELFOGEL:  Just give me a moment.

12  I may be finished.

13          (Pause)

14      Q.  Do you recall on an annual basis, did you

15  receive counseling with respect to your attendance

16  record each year?

17      A.  End of the year review?  Yes, yes.

18      Q.  Did the union representative sit in on that?

19      A.  I don't believe so.

20      Q.  So at the end of each year, your attendance

21  record for that year was reviewed, and you then knew

22  what level you would be on starting the next year?

23      A.  Correct.

24          MR. SPELFOGEL:  I don't have any other

**EXHIBIT C**

**(to Affirmation of Robyn Ruderman in Support
of Defendant's Motion for Summary Judgment)**

Pyong Deletis

32

1   at that time was that I call Peggy Blumer, who is --

2       Q.  Excuse me, is Peggy Blumer your direct

3   manager at that time?

4       A.  No, no, Peggy Blumer is health care provider

5   manager.  And Luann was very upset that she may have

6   to go on level four.  And I called Peggy --

7       Q.  And this would have been in June of 2000?

8       A.  Yes, sometime in June when she come back to

9   work.

10      Q.  2003?

11      A.  Yeah.  And I had called Peggy, "Is there

12  anything that I can do to help her?"  And she said,

13  "Just make sure she provides all the documentation

14  that is necessary."  And I had asked Luann to do

15  that, "Please provide a detailed information so you

16  get your FMLA approved."

17      Q.  But if she had gotten that FMLA approved,

18  she could not have gone down a level, correct?

19      A.  No, but she would not go up the level.

20      Q.  But she couldn't have gone down?

21      A.  No.

22      Q.  Was this after she was on level four that

23  you made your call to Peggy Blumer or --

24      A.  No, she was on level three.

**EXHIBIT D**

**(to Affirmation of Robyn Ruderman in Support
of Defendant's Motion for Summary Judgment)**

DEC 1 2 1996

State Attorney

Dear :....

This is in response to two letters from your office asking a number of questions regarding the definition of the term "serious health condition" under the Family and Medical Leave Act of 1993 (FMLA). I regret that, due to the volume of inquiries and other work associated with administering FMLA, we were not able to respond earlier.

Before answering your specific questions, it may be helpful to first examine the pertinent sections of the FMLA and its implementing regulations, 29 CFR Part 825, and explain their underlying rationale. Under FMLA, "eligible employees" may take leave for, among other reasons, their own serious health conditions that make them unable to perform the essential functions of their position, or to care for immediate family members (i.e., spouse, child, or parent) with serious health conditions. Section 101(11) of FMLA defines serious health condition as "an illness, injury, impairment, or physical or mental condition that involves-

> (A) inpatient care in a hospital, hospice, or residential medical care facility; or
>
> (B) continuing treatment by a health care provider."

Under the express statutory language, any absence involving inpatient care qualifies as a serious health condition. A more difficult task, however, has been to define those illnesses that would qualify as serious health conditions because they involved "continuing treatment by a health care provider."

The legislative history states that the meaning of **serious health condition** "is broad and intended to cover various types of physical and mental conditions" and "is intended to cover conditions or illnesses that affect an employee's health to the extent that he or she must be absent from work on a recurring basis or for more than a few days for treatment or recovery." Similar standards apply to a child, spouse, or parent of the employee who is unable to participate in school or in regular daily activities. The legislative history also states that the term "is not intended to cover short-term conditions for which treatment and recovery are very brief" and "minor illnesses which last only a few days and surgical procedures that typically do not involve hospitalization and require only a brief recovery period. Complications

-2-

arising out of such procedures that develop into 'serious health conditions' will be covered by the act. " * "'

In developing the final regulatory definition of "serious health condition" at section 825.114, the Wage and Hour Division carefully reviewed the statute, the legislative history, the public comments received during rulemaking, and its enforcement experience under the interim regulations. As a result of this review, separate definitions were established for: (1) any period of incapacity due to pregnancy and prenatal care (825.114(a)(2)(ii)); (2) a chronic serious health condition (such as asthma, diabetes, etc., section 825.114(a)(2)(iii)); (3) a permanent or long-term condition for which treatment may not be effective (such as Alzheimers, strokes, terminal diseases, etc., section 825.114(a)(2)(iv)); and (4) to receive multiple treatments (including recovery therefrom) either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment (such as dialysis, chemotherapy, etc., section 825.114(a)(2)(v)).

In addition, the "three-day incapacity" rule coupled with "continuing treatment" portion of the definition of serious health condition was clarified at section 825.114(a)(2)(i) to mean —

> A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> >
> > (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

A "regimen of continuing treatment" is defined in section 825.114(b) to include, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). But the regulations also clarify that the taking of over-the-counter medications such as aspirin, antihistamines, or salves, or bed-rest, drinking fluids, exercise, and other

-3-

similar activities that can be initiated without a visit to a health care provider, do not constitute a regimen of continuing treatment for purposes of FMLA leave.

The final regulations also provide examples, in section 825.114(c), of conditions that *ordinarily*, unless complications arise, would not meet the regulatory definition of a serious health condition and would not, therefore, qualify for FMLA leave: the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc. Ordinarily, it is our expectation that these health conditions would not meet the definition in 825.114(a)(2), as they generally would not last for more than three consecutive calendar days and require continuing treatment by a health care provider as defined in the regulations. If, however, any of these conditions met the regulatory criteria for a serious health condition, e.g., an incapacity of more than three consecutive calendar days that also involves qualifying treatment, then the absence would be protected by the FMLA. For example, if an individual with the flu is incapacitated for more than three consecutive calendar days and receives continuing treatment, e.g., a visit to a health care provider followed by a regimen of care such as prescription drugs like antibiotics, the individual has a qualifying "serious health condition" for purposes of FMLA.

An employer may, when an employee requests FMLA leave for a serious health condition, request a medical certification by the employee's health care provider to confirm that a serious health condition exists. If the employer has reason to doubt the validity of the certification provided, the employer at that time may require that the employee obtain a second opinion from another health care provider (at the employer's expense). Conflicting opinions are resolved by obtaining a third medical opinion as provided in section 103 of FMLA and sections 825.305 through 825.308 of the regulations.

Turning to your particular questions, we have rephrased and amplified them slightly in the discussion below. These answers should be viewed as general guidance that might not be applicable in a particular situation where other significant factors are present.

Question 1A: People on occasion will go to their doctor if their cold or flu lasts more than three days. The doctor may prescribe an antibiotic (which the patient may or may not fill) in case there is a bacterial infection. The regulations state that, ordinarily, unless complications arise, the common cold and flu are not serious health conditions for purposes of FMLA. Can a cold or the flu ever be a serious health condition for purposes of FMLA?

#87

-4-

Answer 1A: Yes, the cold or flu may be a serious health condition for FMLA purposes, if the individual is incapacitated for more than three consecutive calendar days and receives continuing treatment by a health care provider, as defined in the regulations.

Question 1B: What if the employee telephones the doctor but does not actually see the doctor for an examination?

Answer 1B: If an employee who has the flu only telephones the doctor but is not seen or examined by the doctor, those circumstances would not qualify as "treatment" under the regulations. Treatment means an examination to determine if a serious health condition exists, evaluations of the condition, and actual treatment by the health care provider to resolve or alleviate the condition. A telephone conversation is not an examination. An examination or treatment requires a visit to the health care provider to qualify under FMLA.

Question 1C: What if the doctor only prescribes medication "in case your cold turns into something more serious"? What if the employee does not have the prescription filled or does not follow the doctor's orders?

Answer 1C: A prescription that is given "in case your cold develops into something serious" raises the question of whether the existing condition is a serious health condition for purposes of FMLA. In all likelihood, the condition has not yet deteriorated to the point that the illness would qualify as a serious health condition for FMLA leave purposes. An employee who does not follow the doctor's instructions is probably not under a "regimen of continuing treatment by or under the supervision of the health care provider" within the meaning of the FMLA regulations.

Question 1D: What if the doctor advises the employee to stay at home, drink plenty of fluids, and stay in bed for a few days?

Answer 1D: Staying at home, drinking fluids, and staying in bed are activities which can be initiated without a visit to a health care provider and do not constitute "continuing treatment" under the FMLA regulations. See section 825.114(b).

Question 2A: What if the absence is for strep throat or an ear infection, and the employee goes to the doctor and gets a prescription for an antibiotic, is that a serious health condition?

Answer 2A: The circumstances surrounding each illness must be evaluated to see if it meets one of the regulatory definitions of a serious health condition. If either a

-5-

strep throat or ear infection results in an incapacity of more than three consecutive calendar days and involves continuing treatment by a health care provider (which can include a course of prescription medication like an antibiotic), the illness would be considered a serious health condition for purposes of FMLA.

Question 2B: Is strep throat without complications a "serious health condition" just because an antibiotic was prescribed?

Answer 2B: If an illness such as strep throat incapacitates someone for a period of more than three consecutive calendar days and involves continuing treatment by a health care provider (including a course of prescription medication like an antibiotic), the condition qualifies as a serious health condition for purposes of FMLA.

Question 3A: What if the employee stays out because her child has bronchitis? She goes to the doctor and medication may or may not be prescribed. Does this meet the criteria for a "serious health condition"?

Answer 3A: Bronchitis may itself be a serious health condition if it meets one of the regulatory definitions. It is our expectation that bronchitis ordinarily would not be a serious health condition because typically it does not involve an incapacity of more than three consecutive calendar days and continuing treatment by a health care provider as defined by the regulations. In the case where there is only one doctor visit and the doctor does not prescribe any course of medication or other qualifying regimen of treatment to resolve or alleviate the health condition, it would not qualify as "a regimen of continuing treatment" within the meaning of the regulations.

Question 3B: If bronchitis may qualify as a serious health condition, does section 825.208(d) of the regulations contradict this when it says "e.g., bronchitis that turns into bronchial pneumonia"?

Answer 3B: No. The complications of an illness that is not itself ordinarily a serious health condition, i.e., does not routinely meet FMLA's definition of a serious health condition, may convert a routine illness into a serious health condition for FMLA leave purposes (e.g., when bronchitis turns into bronchial pneumonia). In such a situation, it may be difficult to determine when the initial illness became a serious health condition for FMLA leave purposes as a result of complications. Any question regarding the onset of a serious health condition may be resolved by obtaining a medical certification from the employee's health care provider and, where there is reason to doubt the validity of the certification provided, a second medical opinion.

-6-

**Question 4A:** Employees occasionally stay home for a week or more with a child who has chicken pox. Assuming there are no complications, is the employee entitled to leave under FMLA?

**Answer 4A:** Based on the limited information in the situation you describe, there appears to be no continuing treatment by a health care provider that would qualify the absence for FMLA leave.

**Question 4B:** What if the employee gets chicken pox unrelated to a pregnancy?

**Answer 4B:** In the absence of additional information, there appears to be no continuing treatment by a health care provider that would qualify the absence for FMLA leave.

**Question 4C:** What if a doctor advises the employee to stay home for a week?

**Answer 4C:** The regimen of care described in your question appears to be treatment or activities that can be initiated without a visit to a health care provider. Under those circumstances, without other factors, the situations would not qualify as serious health conditions for FMLA leave purposes.

We are providing the additional information you requested on the FMLA under separate cover. I hope you will find this information responsive to your requests.

Sincerely,


Maria Echaveste
Administrator