Linda A. Harvey
Robert R. Thomas
Harvey, Kleger & Thomas
184 Pleasant Valley St. – Suite 1-204
Methuen, MA 01844
(978) 686-9800
Attorneys for Plaintiff
Luann Gould

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Luann Gould,                                              :
                                                          :
                              Plaintiff,                  :     05 CV 11118 (PBS)
                                                          :
         – against –                                      :
                                                          :     **AFFIRMATION OF ROBERT R.**
Lucent Technologies, Inc.,                                :     **THOMAS IN SUPPORT OF**
                                                          :     **PLAINTIFF'S MOTION IN**
                                                          :     **OPPOSITION TO SUMMARY**
                              Defendant.                  :     **JUDGMENT**
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


         **Robert R. Thomas**, an attorney duly licensed to practice law in the Commonwealth of

Massachusetts, affirms under penalty of perjury as follows:

1.       I am an attorney of Harvey, Kleger & Thomas, counsel to Luann Gould

         ("Gould").   This affirmation is submitted in support of Gould's Motion in

         Opposition to Summary Judgment.  All documents attached are true and correct

         copies of the originals.

2.       Pertinent pages from the Deposition Transcript of Luann Gould are annexed here

         as Exhibit A.

3.       Pertinent pages from the Deposition Transcript of Pyong Deletis are annexed here

         as Exhibit B.

WHEREFORE, I respectfully request that the Court deny Lucent's motion for summary judgment in its entirety.

Dated: September 18, 2006


By:    /s/ Robert R. Thomas
       Robert R. Thomas

**EXHIBIT A**

Luann Gould

12

1    New Hampshire.

2        Q.   Is that near Nashua?

3        A.   No.

4        Q.   What part of New Hampshire is that?

5        A.   Outside Plaistow, Hampstead.

6        Q.   Have you taken any educational courses after

7    the eleventh grade?

8        A.   I just received my GED, that's all.

9        Q.   What is that?

10       A.   G E --

11       Q.   G-D --

12       A.   General education.

13       Q.   Diploma?

14       A.   It's equal to a diploma, yeah.

15       Q.   What did you take, additional courses of

16   some sort after the eleventh grade to complete that?

17       A.   At Lucent I just took courses preparing for

18   the GED.

19       Q.   Was Lucent the first job you had after the

20   eleventh grade?

21       A.   Yeah, basically.  I was there since I was

22   19.

23       Q.   When did you begin work at Lucent?

24       A.   October 16, 1979.

Luann Gould

16

1    A.  Yes.

2    Q.  Where is that?

3    A.  7 Bluebird Lane, Atkinson, New Hampshire.

4    Q.  Atkinson?

5    A.  Yeah.

6    Q.  A-K?

7    A.  A-T-K-I-N-S-O-N.

8    Q.  Do you have any children?

9    A.  Yes.

10    Q.  How many?

11    A.  Two.

12    Q.  Ages, sexes?

13    A.  I have a son Edward Desrochers, who is 29

14 years old.  And I have a daughter Shelby Gould, who

15 is eight years old.

16    Q.  When was Shelby born?

17    A.  19 -- July 22, 1997.

18    Q.  Was that before you were divorced?

19    A.  After.  My divorce started in '96, but it

20 didn't end until '97.

21    Q.  Besides Desrochers and Gould, have you been

22 ever known by any other name?

23    A.  No.

24    Q.  What's your present address?

Luann Gould

23

1  employment at Lucent, so that would run it from say

2  about 1996 to 2003, in that approximate time frame,

3  did you have occasion to see any doctors or health

4  care providers for any reason at all?

5      A.  Yes.

6      Q.  Let's do it chronologically.  1996 did you

7  see any doctor, were you under any doctor's care,

8  receive any doctor's treatment in 1996?

9      A.  I don't believe so.

10     Q.  1997?

11     A.  Yes.

12     Q.  Who did you see?

13     A.  For doctors, I was seen by the Women's

14  Health Care.  I saw a Dr. Hayman.  It was at the

15  Women's Health Care.  I saw several doctors there.

16     Q.  What did you see them for?

17     A.  I was having a high risk pregnancy.  I was

18  hospitalized with kidney failure during my

19  pregnancy.

20     Q.  And then of course you gave birth?

21     A.  Correct.

22     Q.  In 1997?

23     A.  Correct.

24     Q.  Did you give birth at a hospital?

Luann Gould

25

1    Q.   Shortly after you gave birth?

2    A.   Yeah.

3    Q.   Within what, months?

4    A.   Within a few months.  But before that

5  situation, two weeks after I delivered Shelby, I was

6  hospitalized in ICU at the Derry Parker Medical for

7  conjunctive heart failure.

8    Q.   Debbie Parker?

9    A.   Derry Parker Medical.

10   Q.   What town is that in?

11   A.   Derry, New Hampshire.

12   Q.   This was two weeks?

13   A.   Prior to delivery.  It was August 6th, my

14  dad's birthday.

15   Q.   Two weeks after --

16   A.   The delivery of Shelby, yeah.

17   Q.   Anything else in 1997?

18   A.   I don't believe so.

19   Q.   Have you had any further treatment or seen

20  any health care providers after 1997 with respect

21  either to your kidney or your heart problems or your

22  tumor problem?

23   A.   Well, other than my kidney problem?  Well, I

24  had kidney surgery later.

Luann Gould

28

1      A.   My daughter had allegations of sexual abuse

2   by her father, and I was being treated by doctors as

3   well as my daughter.

4      Q.   Both she and you went to what kind of a

5   health care provider?

6      A.   She went to her pediatrician, and she went

7   to counseling.  And I also was in counseling and

8   under the care of Dr. Cammerilla, too.

9      Q.   How long did you continue in counseling or

10   with Dr. Cammerilla or any other health care

11   provider in connection with those allegations?

12      A.   It was several months, several months.

13      Q.   In 2002?

14      A.   2000 to 2002.

15      Q.   Do you know approximately how many times

16   altogether you saw the counselor with respect to

17   this?

18      A.   No.

19      Q.   Now, you said 2000 or 2000 --

20      A.   Is when it started.  The allegations were

21   brought to my attention in March of 2000.

22      Q.   And it lasted for how long, the treatment?

23      A.   Because DSS -- the treatment lasted a couple

24   of years.

Luann Gould

29

1    Q.  I interrupted.  You were about to say D-E?

2    A.  DSS was prosecuting.  I went through two

3  trials, the Brentwood Family Court.

4    Q.  Was that eventually resolved and ended in

5  2002?

6    A.  Yes.

7    Q.  During that period of time, were you taking

8  any medication or anything, any kind?

9    A.  Yes.

10    Q.  What?

11    A.  I was taking I believe it was Xanax for

12  anxiety, and I was being treated for depression.

13    Q.  You were taking Zoloft?

14    A.  I'm not sure exactly.

15    Q.  Were you taking any other medication for

16  depression?

17    A.  No.

18    Q.  Leaving aside the situation you've described

19  that began in March 2000 involving the allegations

20  of sexual abuse and through 2002, the family court

21  disposition, during that same period of time, did

22  you have any other medical issues or problems

23  concerning yourself?

24    A.  No.

Luann Gould

47

1      missed from work for any reason?

2          A.  I don't recall.  I may have.

3          Q.  Well, in 1997 you told us that you had

4      certain medical --

5          A.  Yes, yes.

6          Q.  You had the pregnancy and you had the kidney

7      and you had the heart and you had the tumor?

8          A.  Yeah, I was out of work in '97, I know that.

9          Q.  Would it surprise you if I were to tell you

10     the records show that in 1997 you had 86 absences

11     from work; in 1998, 134; in 1999, 119; in 2000, 116;

12     in 2001, 95 absences?

13         A.  No, it wouldn't surprise me.

14         Q.  During that period of time, a number of

15     those absences were covered, weren't they, by Family

16     Medical Leave Act, excused absences?

17         A.  Yes, between that and disability.

18         Q.  Before 2003, do you recall approximately how

19     many times you requested Family Medical Leave Act

20     absences?

21         A.  No, not offhand.

22         Q.  Half a dozen?

23         A.  From when, 1990 what?

24         Q.  1997, from the time -- the year in which you

Luann Gould

49

1    Control Plan?  I'll call it the ACP.

2        A.   Somewhat.

3        Q.   Do you recall the fact that under an Absence

4    Control Plan, there are five levels, one, two,

5    three, four, five and degrees of seriousness?

6        A.   Yes.

7        Q.   What can you tell me about your recollection

8    about the five levels?

9        A.   That they exist.

10       Q.   What was level one, do you know?

11       A.   The first of the levels, first entry of the

12   level system.

13       Q.   Under the Absence Control Plan, you were

14   entitled to a certain number of absences per

15   calendar year, not counting excused absences; is

16   that right?

17       A.   Correct.

18       Q.   Do you remember what the number of absences

19   you were allowed in a year were, the unexcused

20   number you were allowed?

21       A.   I believe it was five days.

22       Q.   And do you recall what some of the absences

23   were that were not counted against your five days?

24   For example, vacations I imagine were not counted,

Luann Gould

50

1    correct?

2        A.   Uh-hum.

3        Q.   And FMLA leave was not counted, correct?

4        A.   Right.

5        Q.   And jury duty was not counted, correct?

6        A.   Correct.

7        Q.   Also not counted against these five days

8    were if you were hospitalized at a hospital,

9    correct?

10       A.   Correct.

11       Q.   And if you had daycare surgery, whether it

12   was in a hospital or a doctor's office, even though

13   you did not have to stay overnight, correct?

14       A.   Correct.

15       Q.   Funeral leave, right?

16       A.   Uh-hum.

17       Q.   And if you were required to appear in court,

18   correct?

19       A.   Correct.

20       Q.   Those were all not counted against your five

21   days?

22       A.   Yes.

23       Q.   Now, am I correct that if you had more than

24   five days of absences in a calendar year that were

Luann Gould

51

1  not exempted under this plan because they didn't

2  fall in the various categories that we just talked

3  about, you went to level one to begin with at the

4  beginning; is that right?

5      A.  Correct.

6      Q.  And once you went on level one, you got a

7  verbal warning; is that right?

8      A.  Yes.

9      Q.  And then if you start the year on level one

10 and you go over your five days allowed for that next

11 calendar year, you moved to level two?

12     A.  Correct.

13     Q.  And at level two, you get a written warning,

14 correct?

15     A.  Yeah, yes.

16     Q.  Then if you begin the year at level two and

17 you go over the -- at that point was it still five

18 days or was it down to four days?  Between level two

19 and three, it was four days, wasn't it?

20     A.  I am not sure.  I know it dropped as the

21 levels or years went on.  I believe it dropped.

22     Q.  Whether it was four days or five days, let's

23 say if you exceeded the allowed non-exempt days, you

24 then moved to level three and got some sort of more

Luann Gould

52

1  formal written warning?

2     A.  Yes.

3     Q.  Once you were on level three under the

4  Absence Control Plan and you got one more

5  non-exempted absence, you would move to level four?

6     A.  Correct.

7     Q.  And at level four, you'd be in effect given

8  a final warning and put on a probationary basis; is

9  that right?

10    A.  I believe so.

11    Q.  And then once you're on level four, if you

12  have one additional non-exempted absence during that

13  same calendar year, that's termination, correct?

14    A.  In some cases.  Some cases people have been

15  on level five and put on probation.

16    Q.  Now, when you began calendar year 2003, you

17  were already on level three, weren't you?

18    A.  I believe so.

19    Q.  And you were then absent in early January

20  2003 for several days of non-exempted absences.

21  January 6th, 7th and 8th you were out, did not claim

22  Family Medical Leave Act or any other qualifying or

23. exempting reason to be out those days, and those

24  were counted against your allowance; is that

Luann Gould

53

1    correct?

2        A.    Correct.

3        Q.    Then in 2003, you were out again in March,

4    March 3rd through March 28th, approximately three

5    and a half weeks.  But that was all a requested and

6    a granted FMLA leave; do you recall that?

7        A.    I don't recall being out that many days in

8    March at one time.

9        Q.    Do you recall being out in March, though, on

10   an FMLA leave situation?

11       A.    March I believe my daughter had bac -- I'm

12   not sure if she had strep throat or bacterial

13   infection.  It was one of them.  I was out for a few

14   days.

15       Q.    Do you remember being out in March and you

16   requested -- March 2003 for at least a few days and

17   you requested FMLA leave, it was granted, you just

18   don't remember the number of days?

19       A.    Correct.

20             MR. SPELFOGEL:  Just so the record is

21   clear, I've marked the Absence Control Plan as Gould

22   Exhibit Number 4.

23       Q.    You were then absent in May 2003 I believe

24   for two days; is that right?

Luann Gould

58

1   what it says there?  This FMLA is what?

2       A.  Is not qualified.

3       Q.  All right.  Can you tell who signed that?

4       A.  Yes, Peggy Blumer.

5       Q.  Who is Peggy Blumer?

6       A.  She's from New Jersey.  She works in the

7   health services department.

8       Q.  Employed by Lucent?

9       A.  Yes.

10      Q.  Now, the second page, who wrote that first

11  line, Greater Hampstead Family?

12      A.  I did, Luann.

13      Q.  And then you signed immediately after that?

14      A.  Correct.

15      Q.  And you dated it, May 7, '03?

16      A.  Correct.

17      Q.  Did you fill out the next few lines, item

18  one and item two?

19      A.  Yes, I did.

20      Q.  What about item -- the rest of the items?

21  Item three is not filled out.  Item four says -- I

22  think it says Luann was absent due to illness of her

23  daughter; is that correct?

24      A.  Correct.

Luann Gould

65

1    had underlined that.  Did you underline that?

2        A.  No, I didn't.

3        Q.  Did somebody at Lucent underline that for

4    you?  It wasn't underlined in your presence?

5        A.  I don't recall it.

6        Q.  Were you out of work for more than three

7    consecutive calendar days because of your daughter's

8    condition in May of 2003?

9        A.  In May for the chicken pox?

10       Q.  Correct.

11       A.  I believe it was two days.

12       Q.  Were you out of work for more than three

13   consecutive calendar days in July 2003 because of

14   the conjunctivitis condition of your daughter?

15       A.  No.

16       Q.  Now, in July when your daughter had

17   conjunctivitis, did you take your daughter to the

18   doctor, also?

19       A.  Yes.

20       Q.  Was it to Dr. Cammerilla?

21       A.  Yes.

22       Q.  So that was about a ten-minute drive in each

23   direction; is that right?

24       A.  Correct.

Luann Gould

71

1    Q.  Do you recall at any time during July 2003

2    having a conversation with Pyong Deletis about your

3    FMLA situation?

4    A.  On July 7th when I called into work and

5    spoke to Pyong, I told her that, you know, the

6    situation my daughter, and she had told me that she

7    had already contacted Peggy Blumer in New Jersey and

8    let her know I was out again.  And she said Peggy

9    said you have no days left.  And I told her that my

10   daughter was contagious.  I had to be home with her,

11   and I would be in the following day, which I did.

12   Q.  So Ms. Deletis suggested that you contact

13   Peggy Blumer directly, and you did?

14   A.  She didn't suggest I contact Peggy Blumer.

15   She suggested I get the FMLA paperwork filled out

16   from the doctor at that time, the day I spoke to her

17   on 7/7.

18   Q.  And did you get it filled out by the doctor?

19   A.  Yes, I did, yes.

20   Q.  Do you know whether Ms. Deletis herself

21   contacted Ms. Blumer to see if there was anything

22   you could do to help with your qualifying for FMLA

23   leave?

24   A.  I don't know if there was any conversation

Luann Gould

81

1      A.  Brian Ahern, Steve Sickel.

2      Q.  Was Ms. Deletis there?

3      A.  Yes, and Steve Sickel's supervisor, too, I

4  believe the function manager, Mark.  The union, Gary

5  Nielson was there.  And I believe that would be it.

6      Q.  Was there any discussion?

7      A.  They handed me this paper and --

8      Q.  Who handed it to you?

9      A.  I believe it was Steve Sickel.

10     Q.  Who said what to whom?

11     A.  Said that -- I believe he told me that I was

12 being put on level five, and I was going to be

13 terminated.

14     Q.  Did he or anyone else at that meeting go

15 over the information on the level five form?

16     A.  Well, they said because of me not qualifying

17 brought me up to level five.  And I begged Steve

18 Sickel to not let me lose my job.  That I had a half

19 a vacation day left, and I need my job to take care

20 of my child.  And there was no hearing of anything

21 from me.  He told me that the decision had been

22 made, and I was leaving today.  There was no

23 talking.

24     Q.  Was there a union representative present

Luann Gould

87

1     A.  She had suggested that, you know, to call

2  her.  And I had already, you know, given her all the

3  FMLA paperwork and all.  I was told by the union

4  that there was no need to contact Peggy Blumer any

5  further.

6     Q.  Now, you have an allegation in paragraph 31

7  of your complaint in this matter, which I'm sure

8  your attorney can show you here, in which you allege

9  that Peggy Blumer told your supervisor that she

10  would have denied your previous request for FMLA

11  leave time off in March 2003 that other persons at

12  Lucent had approved.  How do you know that?

13     A.  It was in the documentation that the union

14  had gotten from e-mails stating that had she been

15  the health care provider on the previous FMLA, that

16  she would also have not qualified those.

17     Q.  Do you have a copy or copies of the material

18  you are referring to?

19     A.  I believe my lawyer has it.

20        MR. SPELFOGEL:  Could we have that

21  produced, please?

22        MR. THOMAS:  Yes.

23        MR. SPELFOGEL:  We'll reserve Gould

24  Exhibit Number 16.

Luann Gould

89

1    when I was out is the day that Peggy Blumer denied

2    the May.  And then from there on, it went on level

3    five from the 7th and termination.

4        Q.  Let me see if I understand you correctly.  I

5    believe what you just said was that you believe the

6    company violated the Family Medical Leave Act in

7    connection with your May 2003 absence because it

8    didn't tell you it was denying FMLA leave until

9    after the July 7th absence?

10       A.  Yeah, I didn't know if it was approved,

11   denied.

12       Q.  Why do you allege that the denial of your

13   July 7th absence as FMLA leave was illegal?

14       A.  Because it was a serious illness.  Because

15   if it wasn't treated, it could lead to blindness.

16   And they stated it wasn't a serious illness, and it

17   was.  And she was on treatment, on medication all

18   that week.  They said three days of illness, and it

19   was over three days.  If it didn't fall under the

20   Family Medical Leave, it would have fallen under

21   Small Necessity Leave.  That was never mentioned to

22   me until after the August 1st termination.

23       Q.  Why do you believe it was qualified leave or

24   should have been qualified leave under the Small

Luann Gould

91

1  retaliated against me?

2      Q.  No, do you have any evidence of retaliation,

3  except for the fact that you were terminated, you

4  lost your job?

5      A.  Well, documentation, holding back paperwork

6  and documentations that I've seen from e-mails back

7  and forth about how she would have denied my

8  previous ones.  There's no reason --

9      Q.  These are the documents that we've already

10 reserved Exhibit Numbers 16 and 17 for; is that

11 right?

12              MR. THOMAS:  Correct.

13     A.  Correct.

14     Q.  Besides that documentation and the fact that

15 you lost your job, do you have any other evidence

16 that you were retaliated against?

17     A.  Well, I don't know -- can I ask my lawyer if

18 I can --

19     Q.  Of course.

20              (Attorney/client discussion off the

21 record)

22     A.  Well, there was comment from an employee in

23 my department that they had known that I was going

24 to be terminated, that Pyong had told the layout