Linda A. Harvey
Robert R. Thomas
Harvey, Kleger & Thomas
184 Pleasant Valley St. – Suite 1-204
Methuen, MA 01844
(978) 686-9800
Attorneys for Plaintiff
Luann Gould

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------ x

Luann Gould,                              :
                                          :
                          Plaintiff,      :    05 CV 11118 (PBS)
                                          :
          – against –                     :
                                          :    **AFFIRMATION OF ROBERT R.**
Lucent Technologies, Inc.,                :    **THOMAS IN SUPPORT OF**
                                          :    **PLAINTIFF'S MOTION IN**
                                          :    **OPPOSITION TO SUMMARY**
                          Defendant.      :    **JUDGMENT** *Part II*

------------------------------------------ x

    **Robert R. Thomas**, an attorney duly licensed to practice law in the Commonwealth of

Massachusetts, affirms under penalty of perjury as follows:

1.    I am an attorney of Harvey, Kleger & Thomas, counsel to Luann Gould

("Gould"). This affirmation is submitted in support of Gould's Motion in

Opposition to Summary Judgment. All documents attached are true and correct

copies of the originals.

2.    Pertinent pages from the Deposition Transcript of Luann Gould are annexed here

as Exhibit A.

3.    Pertinent pages from the Deposition Transcript of Pyong Deletis are annexed here

as Exhibit B.

WHEREFORE, I respectfully request that the Court deny Lucent's motion for summary judgment in its entirety.

Dated: September 18, 2006

By:   <u>/s/ Robert R. Thomas</u>
        Robert R. Thomas

**EXHIBIT A**

Luann Gould

96

1    A.  On August 1st.  And there was another

2  employee that was terminated approximately two

3  months after I, same job I was doing, same

4  supervisor.  He witnessed him being terminated --

5  well, witnessed him being called to be terminated,

6  let go.

7    Q.  Was it also for excessive absenteeism?

8    A.  His was more fraud, I would say.  And he's

9  now back full time, vice president of the union.

10  And, you know, he witnessed him being walked out,

11  and now he's back.  And there's people in the area

12  that have been on level five probation.  They're

13  still there.

14    Q.  Who, to your knowledge, was at level five

15  and was put on probation and not terminated?

16    A.  The union was going to give me a list of

17  everybody that was on level five at the time.  I

18  don't know if they'll still provide it to me or not.

19  But I'm sure the company has records.  But there was

20  an individual in the department, Brent, I don't know

21  his last name, that was on level five probation.

22  There has been several people in the plant that have

23  been given probation.

24    Q.  Do you know to your own knowledge any

Luann Gould

102

1    than three consecutive calendar days.  I have some

2    questions to ask you about this.  Not about the

3    form.  This is more about the actual time that

4    Shelby was sick or receiving treatment.  So I'd like

5    to ask you both about the times in May and also in

6    July.  Let's move backwards.  We'll start with July.

7    In July, you were off from work on July 7th; is that

8    correct?

9        A.  Correct.

10       Q.  Is it your testimony today that Shelby was

11   sick or incapacitated for a longer period of time

12   than the single day that you were out on July 7th?

13       A.  Yes.

14       Q.  Please explain to me, what would that be?

15       A.  It started over the July 4th weekend.  I

16   believe it was Saturday, either late Friday night or

17   Saturday I noticed her eye was swelling up, didn't

18   know if it was a bug bite or not.  It progressively

19   got worse.  By Sunday she couldn't open her eye.  It

20   was all crusted up.  I had to take hot compresses so

21   she could open up her eye.  And I knew it wasn't

22   just a bite at that time.  That's why on Monday when

23   the doctor's office opened, I had called him up,

24   because she couldn't even open up her eye in the

Luann Gould

103

1    morning.  And I had called up the doctor's office,

2    and they said they needed to see her so they could

3    see what was wrong and treat it.

4       Q.  Okay.  Did the doctor prescribe a

5    prescription?

6       A.  Yes, she was given an antibiotic.  I believe

7    it was two to three times a day she had to have the

8    ointment in her eye.  And it was five to seven days

9    of treatment.

10      Q.  Did you give her the ointment treatment?

11      A.  Yes, I did.

12      Q.  How long did that last, approximately?

13      A.  I believe it was a week of treatment with

14   ointment.

15      Q.  Is the doctor's office open on the weekends?

16      A.  No.

17      Q.  Do you remember -- this is for the July 4th

18   weekend.  Do you remember whether you called the

19   doctor's office or not over the weekend?

20      A.  I believe I tried to call, but there was no

21   answer.  And there was no -- like sometimes they'll

22   leave an emergency number.  I don't believe there

23   was anyone there at the office.

24      Q.  So that lead you to call them on Monday,

Luann Gould

104

1    July 7th?

2        A.   Correct.

3        Q.   And to schedule an appointment?

4        A.   Correct.

5        Q.   So just as a mother and a layperson, someone

6    who's not a professional, is it your view that -- I

7    mean, is it clear to you that Shelby was sick for

8    more than three days?

9        A.   Absolutely, yes.

10        Q.   And those were consecutive days?

11        A.   Consecutive days, yes.

12        Q.   I'd like to go just back in time to the May

13    chicken pox.  Once again, we've talked about how you

14    were out of work for May 5th and 6th.  I'm not sure

15    if you were out of work for the 7th or not.  Do you

16    recall?

17        A.   I don't recall.  I believe I returned to

18    work on the 7th of May.

19        Q.   Counsel has already reflected that Monday --

20    May 5th was a Monday.  So you were out of work on

21    Monday, May 5th and Tuesday the 6th.  Was Shelby

22    sick with chicken pox, to your knowledge, prior to

23    your days off from work?

24        A.   She had marks on her on her bottom, and they

Luann Gould

105

1    were itchy.  Then the next morning she woke up,

2    there was more on her.  Then by the time I took her

3    on Monday, they had come out more.  They were more

4    exposed, and I had taken her on Monday.  It started

5    off with a few, and over the two days it got worse.

6         Q.  I'd just like to clarify.  When did you

7    notice --

8         A.  It was on a Saturday.

9         Q.  Excuse me, let me ask the question first.

10    When did you notice that Shelby was sick?

11         A.  Well, when she told me she was real itchy,

12    and she was having a bath on Saturday, I noticed she

13    had some dots on her bottom.  Then as the day got

14    on, it got worse.  By Monday, she had several

15    chicken pox come out.

16         Q.  When did you go to the doctor in May?

17         A.  That Monday, May 5th.

18         Q.  Do you remember who you saw specifically,

19    which doctor or which nurse practitioner?

20         A.  I want to say it was -- I want to say maybe

21    it was Nicole that went into the room and saw her.

22         Q.  If it were Nicole, do you recall whether she

23    prescribed anything for Shelby?

24         A.  Well, there's no prescription.  You have to

Luann Gould

106

1    keep them quarantined, and you have to let it run

2    its course.  Just to be in a bath.  She told me for

3    itchiness, Benadryl.  Basically aspirin for the

4    fever.  That's the care I gave her.  Lots of fluid.

5        Q.  Let me refer to Exhibit 9.  This is one of

6    the FMLA forms.  There are a lot of dates on here.

7    Do you recall when you filled this form out?

8        A.  Well, I may have filled it out right here,

9    7/7.  This is about the chicken pox?

10       Q.  You're referring to the top of the form,

11   page one?

12       A.  This is for the conjunctivitis, right?

13       Q.  I'm sorry, this is for July, yes.

14       A.  Yes, conjunctivitis.  I filled that out on

15   the 7th.

16               MR. SPELFOGEL:  When you say you filled

17   that out, you're referring to the dates on the upper

18   right, there's -- it says, "I hereby request a leave

19   of absence under the Family Medical Leave Act of

20   1993, parens, FMLA, to begin on 7/7/03 and to

21   continue through," and then it looks like it says

22   7/7/03 and then under it, it says 7/8/03.

23               MR. THOMAS:  Crossed out.

24               MR. SPELFOGEL:  I'm not certain, the

Luann Gould

108

1   he said.  We're not sure about that at that time.

2   That was 7/10.

3        Q.  So just to clarify, your understanding is

4   that the two days pending may have been in reference

5   to the May or the earlier leave time that you

6   requested off?

7        A.  Yes.

8        Q.  That was still in limbo?

9        A.  Correct.

10       Q.  Okay, thanks.  I'd like to just -- I'm

11  sorry, jump back to Exhibit 14 regarding the May

12  chicken pox.  On page one of this, I'd like you to

13  look at number 5A.  This is page one of four in the

14  middle.  Can you read the handwriting that's filled

15  in?  The question is state the approximate date the

16  condition commenced.  And then the answer is, can

17  you read that?  Can I suggest that --

18            MR. SPELFOGEL:  That says lesions.

19       A.  Lesions first noticed on 5/3/03 by patient's

20  mother.  Is expected to return to normal activities

21  on 5/7/03.

22       Q.  To the best of your knowledge, who filled

23  out number 5A?

24       A.  That's from Dr. Cammerilla's office.

Luann Gould

109

1    Q.   If you look on page -- on the next page

2  where this continues --

3    A.   Nicole.

4    Q.   There's a signature.  Whose signature is

5  that?

6    A.   That's Nicole May.

7    Q.   And next to it there is a stamp which has

8  her name?

9    A.   Correct.

10   Q.   Is that correct?

11   A.   Correct.

12   Q.   So do you believe or recall that she filled

13 this out for you?

14   A.   Yes, because she asked me, you know, when

15 you bring them in, they ask you when you first

16 noticed it.

17   Q.   So you would have provided this information

18 to her?

19   A.   Correct.

20   Q.   And the dates again are from what date?

21   A.   5/3/03 to 5/7/03.

22   Q.   So that's more than three calendar days,

23 correct?

24   A.   Correct.

Luann Gould

110

1      Q.  You mentioned at the time you were

2  terminated or told of that on August 1, 2003, there

3  was a meeting; is that correct?

4      A.  Yes.

5      Q.  Did you bring up the fact in that meeting

6  that you believed that you had vacation time

7  available?

8      A.  Yes.

9      Q.  Do you remember what you said?

10     A.  I said that I had four hours of vacation

11  time.  And Steve Sickel said he was aware of that.

12  And that was it.

13     Q.  Did you ask him to consider that as a reason

14  not to terminate you?

15     A.  Yes, I asked him if they could give me two

16  hours of unpaid excused absence so it would give me

17  the six hours, which I guess by law is -- six hours

18  is considered hours of time worked, so that I

19  wouldn't be triggered as a day.

20     Q.  And he didn't listen to your request?

21          MR. SPELFOGEL:  Objection.

22     Q.  He didn't honor your request?

23     A.  No.

24     Q.  Did anyone at Lucent in a managerial

Luann Gould

111

1  capacity or human resources capacity ever tell you

2  that you might be able to use the Small Necessities

3  Leave Act?

4      A.  No.

5      Q.  To cover some of your absences?

6      A.  No.

7      Q.  When did you first find out about the SNLA,

8  which is the Small Necessities Leave Act?

9      A.  After I was terminated from the company when

10  a union representative asked why I wasn't offered

11  the Small Necessity Leave Act, and the president's

12  response was that the company wanted me fired.

13      Q.  Just to clarify your testimony --

14          MR. SPELFOGEL:  Objection.  Her

15  testimony speaks for itself.  You don't have to

16  restate it.

17          MR. THOMAS:  Okay, I believe it does.

18      Q.  Were you ever told that there was an appeal

19  process to the Lucent Absence Control Plan?

20      A.  The grievance you're talking about?

21  Grievance, appeal, same thing.

22      Q.  Yes.  Why don't you just answer to the best

23  of your ability.

24      A.  I was told by the union that there was going

**EXHIBIT B**

Pyong Deletis

33

1    Q.  She was on level three?

2    A.  Yes.

3    Q.  Is it your testimony that you wanted to help

4 her from going to level four?

5    A.  Of course.

6    Q.  Okay.  And Peggy Blumer told you about some

7 documentation that she needed?

8    A.  FMLA paper.

9    Q.  Did you in fact provide that to Ms. Gould?

10    A.  Yes.

11    Q.  And then who was your direct supervisor?

12    A.  At that time, Steve Sickel was.

13    Q.  Did you have any conversations with him

14 about Ms. Gould?

15    A.  Yes, I asked him can we help her.  And he

16 goes, "Well, if she provides the right

17 documentation, that's the only thing, that is up to

18 her that she need to provide documentation to Peggy

19 Blumer."

20    Q.  Did you ask anymore questions about what the

21 documentation was that would be necessary?

22    A.  According to Peggy, documentation -- first

23 time when she submitted, she got denied.  It wasn't

24 enough.  It wasn't enough information.  So she asked

Pyong Deletis

35

1    Q.  Do you know who was?

2    A.  No.

3    Q.  Do you know who told her?

4    A.  I was in the room with our direct manager.

5    Q.  And that would have been Mr. Sickel?

6    A.  Steve Sickel, myself and Brian Ahern and

7    president of the union was in the room.

8    Q.  What happened at that conversation?

9    A.  We present the paperwork, days that she --

10   it trigger the absence that she took and why it

11   didn't get approved.  So she got put into level

12   four, and this day trigger to level seven.  And they

13   decide that it's going to be terminated.

14   Q.  You said level seven.  Did you mean level

15   five?

16   A.  Level five, I'm sorry.

17   Q.  And were you aware at that time that

18   Ms. Gould had four hours of vacation time unused?

19   A.  Yes.

20   Q.  So it was really four -- how many days over

21   was she -- how many hours over was she?

22   A.  She was over three and a half days -- three

23   days, I believe.

24   Q.  If you count the two days in --

Pyong Deletis

37

1     A.   Uh-hum, uh-hum.

2     Q.   Do you remember how many -- do you know how

3   many people there were in December of 2003?

4     A.   The same amount of people.

5     Q.   When did it go down to one?

6     A.   Is recently.  Recently it happened, because

7   it was outsourced elsewhere.  That's when we move

8   people, personnel around different organizations.

9     Q.   Of the -- if you know, of the 15 to 18

10   people that were in the stinger shop in the year

11   2003, do you know how many are still working for

12   Lucent?

13     A.   They all do.

14     Q.   Except Ms. Gould?

15     A.   Yes.

16     Q.   Were any of them ever laid off?

17     A.   Not recently, no.  Not since then to today,

18   no.

19     Q.   From 2003 until 2006?

20     A.   No.

21     Q.   The same 15 people --

22     A.   Group of people still there.

23     Q.   Still there?

24     A.   Yeah.

Pyong Deletis

41

1    A.   Yes, I am.

2    Q.   Do you know what the SNLA is?

3    A.   I think that's versus FMLA, I think

4  something smaller.  But it's smaller.

5    Q.   When did you first learn about the SNLA?

6    A.   That's always exist, but I -- it's not

7  that -- FMLA is the one that we use.  We don't -- I

8  don't remember using --

9    Q.   SNLA?

10    A.   Yeah.

11    Q.   Do you ever remember asking Luann Gould if

12  she wanted to utilize the SNLA?

13    A.   No, I don't remember.

14    Q.   Have you ever had anyone ask you to utilize

15  the SNLA?

16    A.   I don't, no.

17    Q.   Do you know what it's for, SNLA?

18    A.   It's something similar to FMLA, but I'm not

19  sure.

20    Q.   Okay, fair enough.  To your knowledge, how

21  many union workers have been recalled by Lucent

22  since 2003, if you know?

23    A.   I don't know.

24    Q.   Do you know if any have been?

Pyong Deletis

43

1   argue the law.  You're asking her for some factual

2   questions --

3            MS. HARVEY:  I'm asking her from a

4   factual point of view.

5       Q.  Do you think that the reasons were valid for

6   her to be terminated?

7            MR. SPELFOGEL:  When you say reasons, I

8   don't understand what you're talking about.  That

9   she moved from level three to four to five, did she

10  exceed factually?  Did she exceed the number of days

11  to move?  Did she exceed the number of days?

12           MS. HARVEY:  That's not what I'm asking.

13           MR. SPELFOGEL:  You mean, was it the

14  right call?

15      Q.  From a management point of view, you as a

16  manager -- I'll rephrase the question a couple of

17  different ways.

18           Were there any other reasons that Luann

19  was terminated, other than her absences?

20      A.  My personal point?  She abuse our system.

21      Q.  How did she abuse your system?

22      A.  Because she knows that we have so many days

23  we allowed.  She have a child who needs her care.

24  So if you plan your days accordingly, there's more

Pyong Deletis

52

1    were going to announce that she was on level five

2    and terminated?

3        A.   I believe it's the board, ACP board.

4        Q.   Did you get a letter from them saying that

5    you're -- how did you know what to do that day?

6        A.   Our manager will call us.

7        Q.   Mr. Sickel?

8        A.   Yes.

9        Q.   Do you remember what he said?

10       A.   He says, "We are meeting with Luann, and we

11   need you to be in the office and bring her folders

12   and everything."

13       Q.   Did you know before Luann -- before you went

14   into that meeting that she was going to be fired?

15       A.   No.   We know she's going on level five,

16   because she didn't get approved FMLA.

17       Q.   But did you think she had a chance of being

18   on probation?

19       A.   Chance, it could have been anybody.

20       Q.   Were you ever asked if she should be on

21   probation?

22       A.   No.

23       Q.   Did you think she should have been put on

24   probation?

Pyong Deletis

53

1      A.   I never thought about it.

2      Q.   But you did think she abused the system?

3      A.   Yes, I did, yeah.

4      Q.   Did she abuse the system in any other way,

5   other than being absent?

6      A.   She's not a best worker.

7      Q.   Did she abuse the system in any other way,

8   other than being absent?

9      A.   No.

10      Q.   Was she a good worker?

11      A.   No.

12      Q.   She was not a good worker?

13      A.   No.

14      Q.   What were her reviews like?

15      A.   Her review?  I haven't given her a review.

16   I never had opportunity to give her any kind of

17   review.

18      Q.   Did you ever -- well, you observed her,

19   correct?

20      A.   Yeah.

21      Q.   And you did not think she was good?

22      A.   I don't think she was very good worker, no.

23      Q.   Why wasn't she a good worker?

24      A.   Because she's never at her position.  I need

Pyong Deletis

54

1    to speak to her.  I need to get this done, this

2    done, this done.  She's never pro-active.

3        Q.  How many times did you have to speak to her?

4        A.  I don't recall.

5        Q.  Every day?

6        A.  Not every day.  I can't just watch one

7    person.  I mean, I don't manage one person.  I

8    manage a whole group.

9        Q.  In the course of a week, how many times did

10   you have to tell her to go to her position?

11       A.  For instance, she was doing ESD.

12       Q.  Could you just explain what that is?

13       A.  It's electronic -- electricity static

14   discharge.  And we have to be grounded, all of us,

15   to touch the circuit packs and stuff.  So she go

16   around and check everyone's wrist strap.  It roughly

17   takes maybe 20 minutes to do entire 12 people.  It

18   doesn't take long.  She would spend like two hours

19   to do that, because she would like to talk.  I mean,

20   it's okay if we're not terribly busy.  It's not

21   okay, but you can overlook.

22       Q.  Did you ever give her a verbal warning for

23   that?

24       A.  No, I ask her let's get it done so we can go

Pyong Deletis

55

1    to the next operation.

2        Q.  Did you ever go to her steward and say,

3    "Hey, I'm not happy with what she's doing"?

4        A.  No.

5        Q.  But you didn't think she was a good worker?

6        A.  No.

7        Q.  Did she ever take an extra long lunch?

8        A.  Yes.

9        Q.  Was that ever reported?

10        A.  I'm not sure.

11        Q.  When did you notice she wasn't a good

12    worker?

13        A.  She only worked for me two month directly.

14        Q.  Was it the first week you noticed that she

15    wasn't good?

16        A.  I didn't say she wasn't good.  I say she

17    wasn't --

18        Q.  I asked you if she was a good worker, and

19    you said no.

20        A.  She's not a very good worker, no.

21        Q.  Well, when did you notice -- how was her

22    work the first week?

23        A.  First week was okay.

24        Q.  What about the second week?

Pyong Deletis

56

1    A.   Second week she start leaving the work areas

2    a half an hour at a time, and it wasn't break time,

3    it wasn't lunch time.

4    Q.   Did anybody else in the department ever

5    leave his or her area?

6    A.   Not long period of time, no.

7    Q.   She was the only one out of 15 to 18 people

8    that did?

9    A.   If employee come to me and say look, I need

10    to go to this place, cafeteria, I need to go speak

11    to union steward, I need to go -- that's okay.  But

12    you don't just leave and leave for half an hour, 45

13    minutes.

14    Q.   How long was the longest time she'd leave?

15    A.   I don't remember.

16    Q.   Did you ever talk to anybody about that?

17    A.   I spoke to Luann.

18    Q.   Did you ever speak to Brian Ahern about

19    that?

20    A.   No.

21    Q.   Did you ever speak to Mr. Sickler?

22    A.   No.

23        MR. SPELFOGEL:  Sickel, I think.

24        MS. HARVEY:  Sickel, sorry.  I have no